**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DONALD RAY HINTON,       )
                              )
          Plaintiff      )
                              )
          v.           )     Case Number:  1:07-CV-00807
                              )     Judge Robertson
DISTRICT OF COLUMBIA, *et. al.,*  )
                              )
         Defendants.    )

## DEFENDANTS' PARTIAL MOTION FOR SUMMARY JUDGMENT

Defendants, District of Columbia, Shawnee Nowlin, and Marcia Slaughter, by and through undersigned counsel, move this Honorable Court, pursuant FED R. CIV. P. 56, for partial summary judgment on the claims filed against them for the following reasons:

1.    Plaintiff's constitutional claims under 42 U.S.C. § 1983 against the District should be dismissed because the District cannot be held liable for the alleged constitutional misconduct of its employees under *respondeat superior* liability, and plaintiff has failed to adduce evidence that the District's customs, practices, and/or policies were the moving force that caused his constitutional injuries.

2.    Plaintiff has failed to designate an expert witness to establish the applicable national standard of care in order to continue to maintain his negligent training and supervision claim.

3.    Plaintiff's claim of Negligent Infliction of Emotional Distress against all named defendants is mischaracterized because the underlying alleged conduct was an intentional tort. Therefore, dismissal of the claim is appropriate.

A memorandum of points and authorities is hereto attached in support of this motion.

Respectfully submitted,

PETER J. NICKELS
Interim Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division


/s/ Patricia A. Jones
PATRICIA A. JONES [428132]
Chief, General Litigation Sec. IV


/s/Zuberi B. Williams
MICHAEL P. BRUCKHEIM [455192]
ZUBERI BAKARI WILLIAMS[1]
Assistant Attorney General
Office of the Attorney General
441 Fourth Street, N.W., Room 6N013
Washington, D.C. 20001
Office: (202) 724-6649; (202) 724-6650; (202) 727-6295
Facsimile: (202) 727-3625
Email:  Michael.Bruckheim@dc.gov;
            Zuberi.Williams@dc.gov

---

[1] Appearing under Rule 49(c)(4) of the District of Columbia Court of Appeals, and LCvR 83.2.

## LCvR 7(m) CERTIFICATION

On March 3, 2008, undersigned counsel called plaintiff's counsel to discuss the herein sought relief. Plaintiff's counsel indicated that he could not speak to undersigned this day, but would hold the discussion on March 4, 2008. Therefore, this motion should be treated as contested.

/s/Zuberi B. Williams_____
ZUBERI BAKARI WILLIAMS
Assistant Attorney General, D.C

## CERTIFICATE OF SERVICE

I hereby certify that a copy of DEFENDANTS' PARTIAL MOTION FOR SUMMARY JUDGMENT was delivered electronically on March 3, 2008, to:

Louis Fireison, Esq.
4550 Montgomery Ave.
Suite 910N
Bethesda, MD  20814

/s/Zuberi B. Williams_____
ZUBERI BAKARI WILLIAMS
Assistant Attorney General, D.C

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DONALD RAY HINTON,                    )
                                      )
                  Plaintiff           )
                                      )
            v.                        )        Case Number:  1:07-CV-00807
                                      )        Judge Robertson
DISTRICT OF COLUMBIA, *et. al.,*      )
                                      )
                  Defendants.         )


**MEMORANDUM IN SUPPORT OF DEFENDANTS'**
**PARTIAL MOTION FOR SUMMARY JUDGMENT**


A.    **PRELIMINARY STATEMENT**

This case concerns plaintiff Donald Hinton's claims that, while on duty as a registered

nurse at Greater Southeast Community Hospital in Washington, D.C., he was falsely arrested for

disorderly conduct and assault on a police officer by D.C. Metropolitan Police Department

Officers Shawnee Nowlin and Marcia Slaughter.  Plaintiff further alleges that during the arrest the

officers used excessive force, and assaulted and battered him.

Defendants, District of Columbia, Shawnee Nowlin, and Marcia Slaughter, by and through

undersigned counsel, move this Honorable Court, pursuant FED R. CIV P. 56, for partial summary

judgment.

B.    **BACKGROUND**[2]

On May 6, 2006, Officers Slaughter and Nowlin relieved two Metropolitan Police

("MPD") officers who were guarding a hospitalized inmate at Greater Southeast Community

Hospital ("GSECH").  While on duty, Officers Slaughter and Nowlin sat at tables and chairs that

---

[2] The facts in this section are drafted in the light most favorable to plaintiff.  Although  the facts in this manner the
District is not admitting to this version of the events.

were set-up by the previous officers on duty in the hallway directly outside the inmate's hospital room.  Shortly after 8:00 A.M., plaintiff Donald Hinton, a registered nurse at GSECH, claims to have approached Officers Slaughter and Nowlin and told them to remove the furniture from the hallway because it was a violation of the Fire Code.  Deposition of Donald Hinton at 55 – 58, attached as **Exhibit A**.  When the Officers did not immediately comply, plaintiff testified that he left the area and returned with the duty nurse, Ms. Alsobrooks.  Deposition of Alva Alsobrooks at 20, attached hereto as **Exhibit B**.  Ms. Alsobrooks asked the Officers to remove the furniture from the hallway and they complied by returning the furniture back inside the inmate's room.  Alsobrooks Dep. at 24.

The officers were standing outside of the inmate's room and stood in the inmate's doorway and the doorway across the hall.  Alsobrooks Dep. at 26-27.  Plaintiff allegedly told the officers that they had to be in the room with their inmate and could not stand in the doorways of the two (2) rooms.  Alsobrooks Dep. at 28-29.  Plaintiff avers that the officers failed to comply with his request until his administrative supervisor told them they could not remain where they were.  Alsobrooks Dep. at 31  Hinton Dep. at 39 – 40.  The parties' voices allegedly became escalated which caused patients to come in the hall way to look to see what was going on.  Deposition of Judith O'Connell taken on January 17, 2008 ("O'Connell Dep.") at 25-27, attached hereto as **Exhibit C**.  One of the officers allegedly told plaintiff to stop talking or they would arrest him. O'Connell Dep. at 31-32.  Hinton Dep. at 40-41.  Plaintiff was arrested for disorderly conduct and assault on a police officer.  Hinton Dep. at 63-64.

After plaintiff was arrested, he complained of chest pains and was admitted into the emergency room of GSECH.  Hinton Dep. at 78 – 80.  Thereafter, Mr. Hinton was taken to the police station and testified that he spent approximately two (2) nights in jail.  Hinton Dep. at 84.

Mr. Hinton's arrest for assault of a police officer was "no papered" and his arrest for disorderly

conduct was nolle prosequi. He claims that since the incident, he has suffered emotional

damages. Hinton Dep. at 112-17.

## C.    STANDARD OF REVIEW

Under FED. R. CIV. 56(c), summary judgment must be awarded where "the pleadings,

depositions, answers to interrogatories, and admissions on file together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving-party is entitled to

judgment as a matter of law." Summary judgment is not a disfavored procedural shortcut, but

rather it is an integral part of the civil rules as a whole, which are designed to secure the just,

speedy and inexpensive determination of every action. *See Celotex Corp. v. Catrett*, 477 U.S. 317,

327 (1986).

The party seeking summary judgment bears the initial burden of demonstrating the absence

of genuine issues of material fact, the party need not negate the allegations of the complaint with

affidavits or other evidence. *See Beard v. Goodyear Tire & Rubber Co.*, 587 A.2d 195 (D.C. 1991)

(*citing Celotex Corp. v. Catrett*, 477 U.S. at 323). Instead, the moving party may rely upon an

absence of proof concerning *essential elements* of the plaintiff's claim. *Beard*, 587 A.2d at 198.

(*emphasis added*). Once the movant has demonstrated that there is no genuine issue of material

fact, the burden shifts to the non-moving party to come forward with specific evidence showing that

genuine issues of material fact exist. *Id.*

The existence of some factual dispute will not defeat a motion for summary judgment --

rather there must be a "genuine issue of material fact." *See Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 247-248 (1986). The evidence must be more than colorable and significantly probative or

summary judgment is the appropriate remedy. *Anderson,* 477 U.S. at 249-250. The "mere

existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to defeat a motion for summary judgment." *See Graff v. Malawar*, 592 A.2d 1038, 1041 (D.C. 1991).

The standard for summary judgment is essentially the same as that for a directed verdict. *Beard*, 587 A.2d at 199. The trial court must determine whether there is sufficient evidence upon which a reasonable juror could find by a preponderance of the evidence that the plaintiff, upon whom the onus of proof is imposed, is entitled to a verdict. *Graff*, 592 A.2d at 1041. Unless the plaintiff can meet that burden, the court must enter judgment in favor of the defendant. *Id.; See also*, *Hill v. White*, 589 A.2d 918, 921 (D.C. 1991).

**D.    ARGUMENT**

        1.    <u>The District is Not Vicariously Liable For Plaintiff's Constitutional Claims Stemming From The Officers' Alleged Constitutional Misconduct</u>

The District is entitled to judgment as a matter of law on plaintiff's constitutional claims under § 1983 because the District is not liable for constitutional claims stemming from Officers Nowlin and Slaughter's alleged constitutional misconduct under a theory of *respondeat superior*. The Supreme Court, in *Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658, 694 (1978), held that while § 1983, claims can be maintained against municipalities, "a municipality can be found liable under § 1983, only where the municipality itself causes the constitutional violation at issue. ***Respondeat superior* or vicarious liability will not attach under § 1983**." *See City of Canton v. Harris*, 489 U.S. 378 (1989) (emphasis added). "A city is answerable under *Monell* when an official policy or custom causes the complainant to suffer a deprivation of constitutional right." *Carter v. District of Columbia*, 795 F.2d 116, 122 (D.C. 1986). "[A] city's inaction, including its failure to train or supervise its employees adequately, constitutes a 'policy or custom' under *Monell* when it can be said that the failure amounts to 'deliberate indifference' towards the constitutional rights of persons in its domain." *Daskalea v.*

*District of Columbia*, 227 F.3d 433, 441 (D.C. 2000) (quoting *City of Canton*, 489 U.S. at 388-89 & n.7).

To support his claim under § 1983, against the District, plaintiff has done nothing more than allege that the District is liable for the "intentional conduct . . . perpetrated by the agents and employees . . . within the scope of their employment." Plaintiff has failed to present proof to support any claim that a District custom, practice or policy was the moving force behind his alleged injuries. When asked at deposition about his §1983 claims – Counts XX, XXI, and XXII – plaintiff testified that the basis of the claim was his belief that the officers acted with malice and without probable cause in arresting him. Hinton Dep. at 110. Also during discovery, the District asked plaintiff to describe in detail his § 1983 claim against the District, and to include what factual support he intended to introduce to prove his claim against the District. Plaintiff gave a factual scenario about the case (by referring to a previous response), but failed to provide any factual basis for his 1983 claim against this defendant. See Interrogatory and Response #14, hereto attached as Exhibit D. Because plaintiff's theory of liability for the alleged constitutional violations committed against him amounts to an assertion that the District is vicariously liable for the conduct of Officers Nowlin and Slaughter, it is entitled to judgment as a matter of law. *See City of Canton*, 489 U.S. at 385 (holding that "*Respondeat superior* or vicarious liability will not attach under § 1983").

    2.    <u>Plaintiff's failure to designate expert testimony defeats his negligent training and supervision claim.</u>

Plaintiff seeks to proceed against the District under both constitutional and common law theories of liability for alleged negligent training and supervision of defendants Nowlin and Slaughter. A municipality may be found liable if it exhibits a pattern of inadequate training, supervision, and discipline of its police officers and these inadequacies are directly connected to

the risk of harm to others.  *See Parker v. District of Columbia*, 850 F.2d 708, 712, (D.C. 1988).

However, merely, "[because the defendant officers] may be unsatisfactorily trained will not

alone suffice to fasten liability on the city." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989.

"Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality can a

city be liable."  *Id.* at 388.  Thus, to support such a claim plaintiff must present "concentrated,

fully packed, precisely delineated scenarios" demonstrating the existence of a pattern or policy.

*Carter*, 795 F.2d at 125.

In any negligence action, a plaintiff bears the burden of proof on the following three

issues in order to prevail:  (1) the applicable standard of care; (2) a deviation from that standard

by the defendant; and (3) a causal relationship between the deviation and the plaintiff's injury.

*Meek v. Shepard*, 484 A.2d 579, 581 (D.C. 1984); *District of Columbia v. Davis*, 386 A.2d 1195,

1200 (D.C. 1978).  To establish a *prima facie* case of negligence, plaintiff must first set forth the

applicable standard of care and a deviation therefrom.  *See District of Columbia v. Peters*, 527

A.2d 1269, 1273 (D.C. 1987); *Bell v. Jones*, 523 A.2d 982, 987 (D.C. 1986).  Proof of a

deviation from the applicable standard of care need not include expert testimony where the

alleged negligence is "within the realm of common knowledge and everyday experience."  *See*

*District of Columbia v. White*, 442 A.2d 159, 164 (D.C. 1982) (quoting *Matthews v. District of*

*Columbia*, 387 A.2d 731, 734-35 (D.C. 1978).  A plaintiff is required to put on expert testimony

where the subject presented is "so distinctly related to some science, profession, or occupation as

to be beyond the ken of the average layperson." *See Peters,* 527 A.2d at 1273; *Davis,* 386 A.2d at

1200.  Police supervision is not a subject matter within the ken of the average jury and therefore

requires expert testimony either pursuant to common law or constitutional law theories of

liability.  *See, e.g., Peters*, 527 A.2d at 1273 (expert testimony required in criminology/law

enforcement); *White,* 442 A.2d at 164-65 (D.C. 1982) (expert testimony required to determine if police breached standard of care); see also *District of Columbia v. Hampton*, 666 A.2d 30, 35 (D.C. 1995) (expert testimony required to establish a standard of care for placing and monitoring children in foster care); *Messina v. District of Columbia*, 663 A.2d 535, 538 (D.C. 1995) (expert testimony necessary to prove standard of care for construction of safe playground equipment); *District of Columbia v. Carmichael*, 577 A.2d 312, 314 (D.C. 1990) (expert testimony necessary to prove standard of care for protecting prison inmates from injury by other prisoners).

In this case, plaintiff alleges that the District of Columbia failed to properly supervise defendants Nowlin and Slaughter, but has failed to produce any factual evidence to support that all the District's officers were not properly trained and/or supervised. In fact, no evidence has been established as to how the District was required to train and/or supervise these officers, and/or that it knew or should have known that its training and/or supervision was deficient . Plaintiff's failure to establish, by expert testimony, the appropriate standard of care for police supervision, and training, and/or that the District breached the standard of care, entitles this defendant to judgment as a matter of law on plaintiff's negligent supervision and training claim against it.

3.    Plaintiff's claim of negligent infliction of emotional distress is mischaracterized as a negligent cause of action because the underlying alleged conduct is an intentional tort

Plaintiff alleges negligent infliction of emotional distress against each defendant. *See* Complaint at 111-27. Specifically, in his Complaint, plaintiff alleges that he was injured as a result of the defendant officers' negligent conduct in arresting him. *See id* (alleging that the officers shoved him against the wall, put their elbow in his back, and handcuffed him). However, the gravamen of plaintiff's complaint is that the officers' conduct amounted to assault and battery. *See* Complaint at Counts IX and X (alleging assault and battery against the Officers). As such, Plaintiff cannot maintain an action for negligent infliction of emotional distress because the underlying conduct alleged is an intentional tort. *Brown v. Argenbright Sec., Inc.,* 782 A.2d 752, 759 n.9 (D.C. 2001) (affirming that "since the conduct alleged, even when viewed in the light most favorable to appellant, is not negligence but an intentional tort, appellant cannot recover damages for negligent infliction of emotional distress based on that conduct.")

In *Maddox v. Bano*, 422 A.2d 763 (D.C. 1980), the District of Columbia Court of Appeals held that the plaintiff's claim alleging excessive force involved only assault and battery, not negligence. The Court stated, "[The] complaint described an injury received as a consequence of excessive force alleged to have been exercised by the arresting officers. There is no dispute that the physical contact was intentional, and such intentional contact constitutes battery…. The only tortious conduct clearly pled is assault and battery. The terms 'carelessly and negligently' are conclusory assertions, and without more the complaint does not raise a cognizable claim of negligence . . . . Moreover, the trial court was not bound by plaintiff's characterization of the action" as one for negligence. *Maddox*, 422 A.2d at 764-65. *See also District of Columbia v. Tinker*, 691 A.2d 57, 64 (D.C. 1997) (same).

Just like the facts in *Maddox*, it is abundantly clear in the instant case plaintiff claims to have been injured as a result of the defendants' intentional acts.  These defendants arrested plaintiff and the physical contact employed, i.e. allegedly grabbing and handcuffing the plaintiff, were intentional acts.  Hinton Dep. at 64, 104-06 (plaintiff testified the officers grabbed him and told him he was under arrest.  There is simply no evidence on the record that either defendant acted *negligently*.   Therefore, these defendants are entitled to summary judgment on plaintiff's' negligent infliction of emotional distress claim since he has mischaracterized the claim as negligence.

Respectfully submitted,

PETER J. NICKELS
Interim Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division


/s/ Patricia A. Jones
PATRICIA A. JONES [428132]
Chief, General Litigation Sec. IV

/s/Zuberi B. Williams
MICHAEL P. BRUCKHEIM [455192]
ZUBERI BAKARI WILLIAMS[3]
Assistant Attorney General
Office of the Attorney General
441 Fourth Street, N.W., Room 6N013
Washington, D.C. 20001
Office: (202) 724-6649; (202) 724-6650; (202) 727-6295
Facsimile: (202) 727-3625
Email: Michael.Bruckheim@dc.gov;
        Zuberi.Williams@dc.gov

---

[3] Appearing under Rule 49(c)(4) of the District of Columbia Court of Appeals, and LCvR 83.2.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DONALD RAY HINTON,        )
        )
     Plaintiff,       )
        )
     v.        )     Case Number: 1:07-CV-00807
        )
        )
        )     Judge Robertson
DISTRICT OF COLUMBIA, *et. al.,*   )
        )
     Defendants.     )

## STATEMENT OF UNDISPUTED FACTS

In support of the defendants' Partial Motion for Summary Judgment, these defendants submit their Statement of Undisputed Fact, and state as follows:

1.     Plaintiff Donald Hinton was a registered nurse at Greater Southeast Community Hospital on May 6, 2006.  Deposition of Donald Hinton at 55 – 58

2.     Plaintiff testified that he approached defendants Officers Slaughter and Nowlin and told them to remove the furniture from the hallway because it was a violation of the Fire Code.  Hinton Dep. at 55-58.

3.     Plaintiff testified that because the officers did not comply, he left the area and returned with the duty nurse, Ms. Alsobrooks.  Deposition of Alva Alsobrooks Dep. at 20.

4.     Ms. Alsobrooks asked the Officers to remove the furniture from the hallway and they complied by returning the furniture back inside the inmate's room.  Alsobrooks Dep. at 24.

5.    Plaintiff avers that the officers were standing outside of the inmate's room and stood in the inmate's doorway and the doorway across the hall, when he told them that they had to be in the room with the inmate they were charged to guard.  Alsobrooks Dep. at 26-29.

6.    Ms. O'Connell testified that as the officers and plaintiff continued to talk their "voices became escalated" to the point that patients were standing in the hall way looking at what was going on.  Deposition of Judith O'Connell at 25-27.

7.    Plaintiff testified that one of the officers told plaintiff to stop talking or they would arrest him. Hinton Dep. at 40-41.   See also, O'Connell Dep. at 31-32.

Plaintiff was arrested for disorderly conduct and assault on a police officer.  Hinton Dep. at 63-64.

8.    After Mr. Hinton was arrested, he complained of chest pains and was admitted into the emergency room of GSECH.  Hinton Dep. at 78 – 80.

9.    Mr. Hinton was taken to the police station and he testified that he spent approximately two (2) nights in jail.  Hinton Dep. at 84.

Mr. Hinton's arrest for assault of a police officer was "no papered" and his arrest for disorderly conduct was nolle prosequi.  Hinton Dep. at 85-86.

10.    When asked at deposition about his §1983 claims – Counts XX, XXI, and XXII – plaintiff testified that the basis of the claim was his belief that the officers acted with malice and without probable cause in arresting him.  Hinton Dep. at 110.

11.    Plaintiff testified the officers grabbed him and told him he was under arrest. Hinton Dep. at 64, 104-06.

12.    During discovery, the District asked plaintiff to describe in detail his § 1983 claim against the District, and to include what factual support he intended to introduce to prove his

claim against the District.  Plaintiff gave a factual scenario about the case (by referring to a previous response), but failed to provide any factual basis for his 1983 claim against this defendant.  See Interrogatory and Response #14, hereto attached as Exhibit D.

Respectfully submitted,

PETER J. NICKELS
Interim Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division

/s/ Patricia A. Jones
PATRICIA A. JONES [428132]
Chief, General Litigation Sec. IV

/s/Zuberi B. Williams
MICHAEL BRUCKHEIM [455192]
ZUBERI BAKARI WILLIAMS[4]
Assistant Attorney General
Office of the Attorney General
441 Fourth Street, N.W.;  Suite 6N013
Washington, D.C. 20001
Office: (202) 724-6650; (202) 727-6295
Facsimile: (202) 727-3625
Email:  Zuberi.Williams@dc.gov

---

[4] Appearing under Rule 49(c)(4) of the District of Columbia Court of Appeals, and LCvR 83.2.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DONALD RAY HINTON, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) Case Number:  1:07-CV-00807 |
| | ) Judge Robertson |
| DISTRICT OF COLUMBIA, *et. al.,* | ) |
| | ) |
| Defendants. | ) |

## <u>ORDER</u>

Upon consideration of the Defendants the District of Columbia, Shawnee Nowlin, and Marcia Slaughter's Motion for Partial Summary Judgment, their supporting Memorandum of Points and Authorities, and the entire record herein, it is, this ____ day _____, 2008,

ORDERED, that the said motion be, and hereby is, GRANTED for the reasons set forth herein, and it is,

FURTHER ORDERED, that plaintiff's constitutional claims under 42 U.S.C. § 1983 against the District are dismissed with prejudice.

FURTHER ORDERED, that plaintiff's claim of negligent training and supervision claim against the District is dismissed with prejudice.

FURTHER ORDERED, plaintiff's claim of Negligent Infliction of Emotional Distress against all named defendants is dismissed with prejudice

So ORDERED.

_____
The Honorable Judge Robertson
United States District Court for D.C.

# EXHIBIT A

1

SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION

DONALD RAY HINTON,          )
                            )
              Plaintiff,    )  Case No.
                            )  1:07-cv-00807
v.                          )
                            )
DISTRICT OF COLUMBIA,       )
and                         )
MARCIA L. SLAUGHTER,        )
and                         )
SHAWNEE NOWLIN,             )
                            )
                            )
              Defendants.   )
_____ )

                    Washington, D.C.
                    Thursday, November 15, 2007

DEPOSITION OF:

              DONALD RAY HINTON

called for examination by counsel for the
Plaintiff, pursuant to Notice of Deposition,
at the Office of the Attorney General, 441 4th
St., N.W., Washington, D.C. at 2:00 p.m., when
were present on behalf of the respective
parties:

ORIGINAL

1      A     Yes.

2      Q     -- about it.  Did you assume that

3   she was telling her hey, this guy needs to be

4   handcuffed and he's not?

5      A     Yes, basically.

6      Q     Okay.  So when Ms. O'Connell went

7   back down the hall towards Room 529, you

8   followed her?

9      A     Yes.

10     Q     Okay.  But you still hadn't spoken

11  to her about what you saw --

12     A     No.

13     Q     -- in the room?  Okay.  When she

14  got to Room 529, what happened next?

15     A     Ms. O'Connell asked them politely

16  to move back into the room with the prisoner.

17     Q     Okay.  Did she something along the

18  lines of could you please move back into the

19  room with the prisoner?

20         MR. FIREISON:  I'd object.  It --

21  why don't you -- I'm sorry -- why don't you

22  just ask him what she said rather than putting

1    words in his mouth?

2            MR. BRUCKHEIM:   Okay.

3    BY MR. BRUCKHEIM:

4        Q    Did  you  --  can  you  recall

5    specifically what she said?

6        A    I want you back into the room with

7    the prisoner.

8        Q    Okay.  She said, I want you back

9    in the room with the prisoner?

10       A    Yes.

11       Q    Okay.  Did she say, please or --

12       A    I don't recall.

13       Q    Okay.  Where were the officers --

14   what was the officers' location when she made

15   that statement to them?

16       A    Setting in chairs with their feet

17   propped on bedside tables.

18       Q    Okay.  I'm sorry.  What tables?

19       A    Bedside tables.   They're tables

20   that goes over the bed so you can eat, feeding

21   patients.

22       Q    Okay.  And were they in the room?

```
 1     They were -- excuse me -- they were out in the

 2     hall?

 3          A     Yes.

 4          Q     Okay.   So the chairs and these

 5     bedside tables are out in the hall?

 6          A     Yes.

 7          Q     Okay.  And would be sitting right

 8     outside Room 529?

 9          A     No.

10          Q     Where were they sitting?

11          A     Approximately ten feet above --

12     from the room.

13          Q     Okay.   So   heard Ms. O'Connell

14     make that request to the officers to go back

15     inside  the  room?    What  did  they  say  in

16     response to that?

17          A     They got angry and stated -- one

18     stated -- I don't know the difference between

19     Slaughter and Nowlin and complected wise who

20     said what.  The darker complected of the two

21     said I'm not moving.  That room, that smells

22     like urine.
```

1      Q      Okay.   So you just -- you told

2      them that it was a fire hazard for the desks

3      and, I guess, for their chairs to be in the

4      hallway?

5      A      It worksheet a JCAHO violation for

6      them to be drinking and eating in the hallway.

7      Q      Okay.   When did you say that to

8      the officers?

9      A      That was going into the room prior

10     to coming out of the -- assessing the patient.

11     Q      Okay.   So you said that to them

12     before you went in to assess the patient?

13     A      No.

14     Q      You said -- oh, prior to coming

15     out?

16     A      Prior to coming out of the room.

17     Q      Okay.   So you finished assessing

18     the patient and that's when you told them --

19     A      Yes.

20     Q      -- this is a fire hazard.

21     A      Yes.

22     Q      Okay.   When you told them that,

1   did they say anything in response to you?

2          A     Yes.

3          Q     What did they say?

4          A     That I better take my ass down the

5   hall before they arrest my ass.

6          Q     Okay.  Did they say anything else

7   or was that it?

8          A     Pardon?

9          Q     Did they say anything other than

10  you better take your ass down the hall or

11  they'll arrest you or is that it?

12         A     That's it.

13         Q     Okay.  When you told them that

14  being in the hall with the desks and the

15  chairs is a fire hazard, that they, you know,

16  shouldn't be eating in the hall, did you use,

17  I guess, a normal speaking voice like we're

18  using today?  Was your voice raised in any

19  way?

20         A     No.

21         Q     Okay.  Can you recall if you said

22  please?

1    MR. FIREISON: Excuse me. I don't

2 mean to interrupt you. I think it was a

3 compounded question. I'm not sure what he's

4 answering yes to, whether he used a normal

5 voice when he asked or -- and there was a

6 second part to your question.

7 BY MR. BRUCKHEIM:

8    Q    I had asked if you were using a

9 normal speaking voice like we're using or if

10 your voice was raised in any way. I assumed

11 you had said yes to that you were using a

12 normal speaking voice?

13    A    Yes, I was.

14    Q    Okay.

15    MR. FIREISON: Thank you.

16 BY MR. BRUCKHEIM:

17    Q    Did you say please or anything

18 like that? Did -- well, strike that. When

19 you told them about the fire hazard, did you

20 ask them to move everything back into the room

21 or did you simply just tell them this is a

22 fire hazard with you being out here?

1          A     It was asked.

2          Q     Okay.  So you asked them to please

3     move back into the room?

4          A     Yes, to move the tables back into

5     the room.

6          Q     Okay.   Because  it  was  a  fire

7     hazard?

8          A     Yes, a violation of JCAHO.

9          Q     A violation of what?

10         A     JCAHO.

11         Q     Could you spell that for the court

12    reporter.

13         A     J-A-C-H-O (sic).

14         Q     Okay.    Those   are   hospital

15    regulations or --

16         A     Governing the bodies of hospitals.

17              MR. FIREISON:  Can I help you with

18    this.  It's J-C-A -- it's Joint Commission on

19    Accreditation of Hospitals.

20              MR. BRUCKHEIM:  Okay.  I've heard

21    the acronym before.

22              MR. FIREISON:  That's all right.

1    I'm jumping around.  I just -- you know, my

2    job is to get as many details as I can, you

3    know, about the incident.  You did testify

4    that one of the officers had grabbed your arm?

5        A    Yes.

6        Q    Okay.  Well, let me back up again.

7    You had described to me the things that you

8    had said to the officers before you went in

9    and  did  the  assessment  and  after  the

10    assessment.  When you went back down the hall

11    with Ms. O'Connell, did you say anything else

12    to  the  officers  at  any  time  before  that

13    officer grabbed your arm?

14        A    It was escalating.  I may have.  I

15    don't recall.

16        Q    You  can't  recall  if  you  said

17    anything or not?

18        A    I knew it was escalating.  I told

19    Ms.  O'Connell  --  I  don't  recall  the  full

20    statement.

21        Q    Is that when you had taken Ms.

22    O'Connell's arm and told her this is getting

1  out of hand and we should go back up?

2       A    Yes.

3       Q    Okay.  Was it shortly after you

4  did that that this officer grabbed your arm?

5       A    Yes.

6       Q    Okay.  When the officer -- when

7  that officer grabbed your arm, what did you

8  do?

9       A    Asked her why was she arresting

10 me.

11      Q    Okay.  When she grabbed your arm,

12 did she say that you were under arrest?

13      A    Yes.

14      Q    Okay.  So she grabbed your arm and

15 at the same time said, okay, you're under

16 arrest?

17      A    Yes.

18      Q    Did she say anything else aside

19 from those words?

20      A    I recall her saying something, not

21 exact words.

22      Q    Okay.  So when she said that and

1      heard the work bitch during this incident?

2              A    Yes.

3              Q    Okay.  So they said to you, who's

4      the bitch now?

5              A    Yes.

6              Q    Okay.  And what did you say to

7      them?

8              A    I said nothing.

9              Q    Okay.  Did they say anything else

10     to you on the way down?

11             A    I don't recall.

12             Q    Okay.  Were they the ones who

13     transported you in the vehicle?

14             A    No.

15             Q    Okay.  You -- that was another

16     officer who took you?

17             A    Yes.

18             Q    Okay.  Were you taken -- you were

19     taken to one of the police stations, one of

20     the district stations?

21             A    Not immediately, no.

22             Q    Okay.  Where did you go first?

1          A       Emergency room.

2          Q       Okay.    Why  did  you  go  to  the

3    emergency room?

4          A       I had chest pain.

5          Q       When  did  you  start  to  feel  these

6    chest pains?

7          A       When  they  attempt  to  put  me  in

8    this paddy wagon -- call them paddy wagon.  It

9    just look like a black ice cream truck.

10         Q       Okay.   So  they  attempted  to  put

11   you in there.  That's the first time that you

12   felt the chest pain?

13         A       Yes.

14         Q       Okay.   Can you describe the pain?

15   Was it sharp pain or the middle or your chest

16   or the side of your chest or --

17         A       Left  side  of  my  chest  and  lower

18   part of my back.

19         Q       Okay.   And it came on suddenly?

20         A       Yes.

21         Q       Okay.

22                 MR.  FIREISON:    I  just  object  to

1    the word suddenly.  I think based on the prior

2    question about his back, he indicated that

3    there was something in his back that was

4    painful.

5    BY MR. BRUCKHEIM:

6         Q    Okay.  The pain in your chest, did

7    that come suddenly?

8         A    As I recall.

9         Q    Okay.  And when you felt that

10   pain, you told the officers about it?

11        A    Yes.

12        Q    Okay.  And where did they bring

13   you from there?

14        A    One of the officers, the shorter

15   of the two short -- one of the officers there,

16   they took me to the emergency room.

17        Q    Okay.  And when you got to the

18   emergency room, were you admitted?

19        A    Yes.

20        Q    Okay.  I'm not going to go into

21   detail by detail as to what happened at the

22   emergency room, but can you recall how long

1    know -- well, strike that.  Did they tell you

2    what it was or how to treat whatever had

3    happened to you?

4         A    I was given digoxin .125

5    milligrams prior to leaving in a packet.

6         Q    Okay.  After you were discharged

7    from the ICU, is that when you were

8    transported to the station, to the police

9    station?

10        A    Yes.

11        Q    Once you were at the police

12   station, did you have stay overnight at the

13   police station or stay overnight in jail at

14   any point?

15        A    Yes.

16        Q    Okay.  How many nights did you

17   have to spend in lockup?

18        A    Approximately two as I can recall.

19        Q    Okay.  Two nights?

20        A    As I recall.

21        Q    Did there come a time when you

22   were -- you appeared before a judge?

85

1          A     Yes.

2          Q     Okay.  And they told you what you

3     were being charged with?

4          A     Yes.

5          Q     Okay.   And  was  it  disorderly

6     conduct?

7          A     As I recall, yes.

8          Q     Okay.  Do you recall them giving

9     you an option to do something called a post

10    and forfeit for $25.00?

11              MR.  FIREISON:    Before  the  judge

12    you're talking about?

13              MR. BEATRICE:  Yes.

14         A     I don't recall.

15    BY MR. BRUCKHEIM:

16         Q     Okay.  Ultimately, with respect to

17    the disorderly conduct charge, that case was

18    dismissed?  Is that right -- and that charge

19    was dismissed to your knowledge?

20         A     I don't recall.

21         Q     Okay.  You never pled guilty to

22    disorderly conduct, right?

1       A      Yes.

2       Q      Okay.  Yes, you never pled guilty?

3       A      Never pled guilty.

4       Q      And that case never went to a

5    trial?

6       A      I don't recall what they charged

7    me with.  I was --

8              MR. FIREISON:  No, that's not that

9    question.  Did you ever go to trial on any

10   charges?  That's where --

11             THE WITNESS:  Yes.

12   BY MR. BRUCKHEIM:

13      Q      You did?

14      A      Yes.

15      Q      You   went   to   trial   on   the

16   disorderly conduct charge?

17      A      Again, I don't know which charge

18   they charged me with.

19      Q      Okay.    Can   you   recall   what

20   happened at the trial?

21      A      I had started having pain.  They

22   put me back in a small cell and they -- one of

1      Q     Was it just one that you felt or

2   worksheet it more than one?

3      A     Just one.

4      Q     Okay.  And you were facing the

5   wall when you felt this elbow or object in

6   your back?

7      A     Yes.

8      Q     Okay.  Do you know if it was

9   Officer Nowlin or Officer Slaughter whose

10  elbow or object was in your back?

11     A     No, I don't.

12     Q     Okay.  Is it fair to say that you

13  couldn't see whose elbow or object was in your

14  back at all?

15     A     I knew it was the officer's elbow

16  or object.  I don't know what it was but I

17  knew it was just her there.

18     Q     Okay.  So you knew it was one

19  officer or the other officer?

20     A     I knew it was the darker

21  complected of the two.

22     Q     Okay.  So it was the darker

1    complected of these two officers who had the

2    elbow-object in your back?

3         A    It was the darker complected of

4    the two that had my arm twisted and at that

5    point, that's when I felt the object in my

6    back.

7         Q    Okay.  Is -- do you believe that

8    it was the same officer who had your arm

9    twisted who also was the source of the object

10   in your back?

11        A    Yes, I do.

12        Q    Okay.  So the grabbing of your arm

13   and the twisting of your arm behind your back

14   and the pressure on your back from the object

15   came from one officer?

16        A    To my knowledge, yes.

17        Q    To your knowledge, but you're not

18   sure if it was Officer Slaughter or Officer

19   Nowlin?

20        A    I knew it was the officer of the

21   darker complected of the two that had my arm.

22        Q    Okay.  What did the other officer

1    do, the one who was not the darker complected

2    one?  Did she ever lay her hands on your?

3         A    I don't recollect her and the man

4    with the gun, and then because there was

5    officers coming from everywhere.

6         Q    Okay.  Is it fair to say that the

7    only officer who you recall actually having

8    contact with you was the one with the darker

9    complexion that you testified to?

10        MR.  FIREISON:    I'd object.    I

11   don't think that was his testimony but you can

12   --

13        MR. BEATRICE:  Okay.

14        THE WITNESS:  No.

15   BY MR. BRUCKHEIM:

16        Q    You    think    there    were    other

17   officers who did have contact with you?

18        A    As I recall, yes.

19        Q    And by contact, I mean physical

20   contact, touching?

21        A    Yes.

22        Q    Okay.  Do you recall what contact,

1      Q      Okay.  She pulled you back on the

2    cuffs?

3      A      Yes.

4      Q      The lighter complexion?

5      A      The lighter complected of the two.

6      Q      Okay.  Is she -- is -- strike

7    that.  Is the lighter complexion officer the

8    one who brought you to the paddy wagon?  In

9    other words, did she --

10      A      No.

11      Q      -- lead you?

12      A      No, no.

13      Q      Okay.  It was the darker

14    complexion?

15      A      Yes.

16      Q      Okay.  Turning to page 11 and

17    looking at counts 10, 11 and 12.  These are

18    counts of malicious prosecution.  Is it your

19    testimony today that Officers Nowlin and

20    Slaughter, that they acted with malice and

21    without probable cause?

22      A      Yes.

112

1    he has suffered and will continue to suffer
2    severe emotional distress and has incurred and
3    may continue to incur significant medical
4    bills.    Have you suffered severe emotional
5    distress after this incident took place?
6            A    Yes.
7            Q    Okay.    Could you describe that
8    distress?
9            A    I'm not sleeping.    I don't go to
10   sleep at night approximately -- probably 3,
11   4:00 o'clock in the morning and I'm up at 6
12   a.m. to go to work and be there by 6:30.    I
13   did start back sleeping until I knew I had, I
14   think on the 7th or probably around the 6th,
15   7th or 8th, knowing I had to come back and
16   deal with this again.
17           Q    Okay.    When you say come back and
18   deal with this again, you mean coming in here
19   for your deposition?
20           A    Yes, for the deposition and just
21   the whole ordeal being brought forth to my
22   attention again.

1    Q    Okay.    You    said    after    this

2    incident    that    you    had    problems    sleeping.

3    Before this incident happened, how many hours

4    of sleep a night would you say you typically

5    received that was normal for you?

6    A    Seven to eight hours of sleep.

7    Q    After this incident happened, how

8    many of hours of sleep did you receive?

9    A    Prior    to    coming    back    here,    I

10    received all seven to eight hours, but knowing

11    to come back here, I would then just the

12    thought of being closed up, I don't sleep.

13    Q    Right after the incident happened,

14    were you -- you were experiencing difficulty

15    sleepy?

16    A    Yes.

17    Q    Okay.    For    how    long    after    the

18    incident    happened    did    you    experience    those

19    difficulties?

20    A    I did not.

21    Q    Okay.    You --

22    A    After    the    incident    happened    and

1    then after the things went over, I recall

2    where I had problems sleeping, but going down

3    the line as -- farther it got away from, as

4    far as time passed, I came back to my pattern.

5        Q    Okay.  As time passed, you went

6    back to the normal sleep cycle that you were

7    used to before the incident?

8        A    Except when thinking of being

9    closed up, I would stay up and just seeing

10   that they were cuffed, just the whole ordeal.

11       Q    When you say closed up, you mean

12   locked up?

13       A    Locked up, in jail, I guess.

14       Q    Did you ever see any kind of

15   professional help just to talk about what had

16   happened and how you were feeling after that?

17       A    My coworkers.

18       Q    Okay.    You talked to your

19   coworkers about it?

20       A    Yes.

21       Q    These are your fellow nurses.

22       A    Yes.

1      Q      Okay.  Which nurses did you talk

2  to about the incident?

3      A      Basically, every nurse or probably

4  the nurses that was there and was aware of the

5  situation.

6      Q      Okay.  Did you ever speak with a

7  psychologist or a counselor or a psychiatrist

8  or social worker or anybody in that big field?

9      A      No, because it carries a stigma.

10  No, I did not.

11      Q      Okay.  In speaking with your

12  coworkers about it, did that help you?

13      A      Yes, it did.

14      Q      Okay.  Some of your coworkers and

15  your friends you would say?

16      A      Yes.  In a way, yes.

17      Q      Okay.  Did you speak with -- you

18  spoke with them about the incident after you

19  returned to work, after the incident happened?

20  Is that right?

21      A      They approached me.  I just wanted

22  it to pass.

1      Q     Okay.  When they approached you,

2    did you talk to them about it at that time, or

3    did you -- what I'm getting at is did you talk

4    about it with them over a period of several

5    days or several weeks?  Was it a conversation

6    that you had with them right when you got back

7    to work and --

8      A     I don't recall.  It was over --

9    some wanted to know what happened and why I

10   was in -- why I was in prison, why -- it was

11   just all in a, I would say, period.  I don't

12   know exactly what time period.

13     Q     Okay.  At the end of that

14   paragraph that I pointed out about emotional

15   distress, it says that you have incurred and

16   may continue to incur significant medical

17   bills.  Can you tell me about what bills

18   you've incurred as a result of this incident?

19     A     Well, not being able to sleep, I

20   take PM -- what is it -- Tylenol PM.

21     Q     Okay.

22     A     And also I'm taking a medication

1    called Pep -- because me going to work, during

2    the day, I'm sleepy and I'm not able to stay

3    awake.

4         Q    Okay.  Is it fair to say that the

5    sleeping problems is the biggest physical

6    problem you've had as a result of this

7    incident?

8         A    No.

9         Q    Okay.  Are there other physical

10   problems you've had as a result of this

11   incident?

12        MR. FIREISON:  Excuse me.  Another

13   one he's testified to or?

14   BY MR. BRUCKHEIM:

15        Q    Other than what you've testified

16   to?

17        A    Not other than I've testified to.

18        Q    And you testified already that you

19   continue to get treatment for your heart

20   condition?

21        A    It's an ongoing process, yes.

22        Q    That's an ongoing process.  Did

# EXHIBIT B

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

+ + + + +

--------------------------+
                          |
DONALD RAY HINTON,        |
                          |
        Plaintiff,        |
                          |
    v.                    |   Case No.
                          |   1:07-CV-00807
DISTRICT OF COLUMBIA,     |
*et al.*                  |
                          |
        Defendants.       |
                          |
--------------------------+

Thursday,
January 17, 2008
Washington, D.C.

DEPOSITION OF:

    ALVA L. ALSOBROOKS

called for examination by counsel for the
Defendants, pursuant to notice of deposition,
in the Office of the Attorney General, 441 4th
Street, NW, when were present on behalf of the
respective parties:

ORIGINAL

1     Okay?

2          A     Okay.

3          Q     Please go ahead.

4          A     It was approximately, I would say,

5     about 8:30 in the morning just starting our

6     shift.   Mr. Hinton approached me at the

7     nurse's station and said that the officers who

8     were assigned to the patient in 529, which is

9     the   room   furthest   away   from   the   nurse's

10    station, that they were in the hallway.

11              They had the patient's listservers

12    and patient's tables in the hallway.   They

13    were on their cell phones and they were eating

14    in the hallway.  He said -- he approached them

15    and asked them to move the equipment into the

16    patient's room because this was a fire hazard.

17              Apparently, they did not respond,

18    so that's the reason why he came to me.   I

19    approached the officers and asked them the

20    same  thing  Mr. Hinton  had  asked  them,  to

21    remove the equipment out of the hallway, that

22    it   created   a   fire   hazard   and   to   take   the

24

1      complected -- I guess medium brown, you said,

2      individual did most of the talking?

3            A      Yes.

4            Q      So, the shorter, lighter skinned

5      individual did less of the talking.

6            A      Yes.  I think that's how it was.

7            Q      Okay.  Okay.  So, you went down

8      the hall.  Which officer did you talk to?

9            A      Both of them.

10           Q      Okay.

11           A      I didn't specify.  I just told

12     both of them that this is creating a fire

13     hazard.  They need to move their equipment and

14     themselves into the room.

15           Q      Okay.  Did any of the officers say

16     anything to you?

17           A      One of the officers, and I think

18     it's the one who was talking most, said,

19     "Okay.  Thank you.  You were nice, but

20     Mr. Hinton was not very nice."

21           Q      Okay.

22           A      That's what she said.

1     A    Not at that time, no.

2     Q    At that time, yes.

3     A    No.

4     Q    They say anything else to you?

5     A    No, they did not.

6     Q    After those officers moved the

7 furniture into the room, what did they do at

8 that time?

9     A    They came out of the room and

10 stood in the hallway.

11     Q    Both officers came out of the

12 room?

13     A    Both officers came out of the room

14 and stood in the hallway.

15     Q    Now, directly in the hallway or in

16 the doorway?

17     A    In the hallway.  They were --

18 actually, they were at another room, which was

19 opposite the room that the patient was

20 assigned.  They were sitting at Room 527,

21 which is opposite the room that they were

22 assigned.  They weren't even in the patient's

1    hallway or anything like that.

2         Q    So, the patient that they were

3    supervising or watching over, what room was

4    that?

5         A    529.

6         Q    Okay.   You said 527, they were

7    standing in front of that room, too?

8         A    That's right.

9         Q    That room is directly across?

10        A    Yes.  Yes.

11        Q    Who, if anybody, was in that room?

12        A    Nobody.

13        Q    Nobody.  It was empty?

14        A    Correct.

15        Q    Okay.  So, after they came back in

16   the hallway, are you still down there with

17   them?

18        A    I'm still down there with them.

19        Q    What, if anything, did you say to

20   them at that point?

21        A    At this point, I was not saying

22   anything, but Mr. Hinton was saying to the

1    officers that they are supposed to be in the

2    room with the patient.

3        Q    Okay.  Let's back up for one

4    second.  I missed something.  It's not you.

5    It's me.  When you came down the hallway, did

6    Mr. Hinton come down the hallway, too?

7        A    Yes, he did.  Yes, he did.

8        Q    Okay.  Did he say anything during

9    this initial time that you just testified to?

10       A    No, he did not.

11       Q    Okay.  Where was he standing?

12       A    He was standing basically beside

13   me.

14       Q    Beside you?

15       A    Uh-hmm.

16       Q    As you were talking to the

17   officers?

18       A    As we were talking to the

19   officers.

20       Q    Okay.  Is this -- when's the first

21   time that he said anything during that

22   encounter?

1    A    After I asked him to move the

2  equipment and they complied, as I was turning

3  around to go back up the hallway, Mr. Hinton

4  kept saying, "You all need to be in the room.

5  You all need to be in the room with the

6  patient."

7          The officer said, and I'm not

8  quoting, just something to this effect, "You

9  had better get down the hall or I'll lock your

10  ass up."  That's what she said.

11          MR. FIREISON:  Or I'll what?  I'm

12  sorry.

13          THE WITNESS:  "Or I will lock your

14  ass up."

15          MR. FIREISON:  Okay.

16          BY MR. WILLIAMS:

17    Q    You heard this as you were walking

18  away?

19    A    Yes, and I asked Mr. Hinton, "Come

20  on down the hall with me.  Just leave it

21  alone.  We're going to call Ms. O'Connell."

22    Q    Okay.  Do you know which officer

1          A       They did stay in the hallway.

2          Q       Okay.  So, now, continue with your

3     story.  You walked up the hallway and --

4          A       I walked up the hallway.  I paged

5     the nursing supervisor, Ms. O'Connell.  She

6     responded to the floor and I gave her a brief

7     synapse of what was going on.

8          Q       Okay.  When you say you gave a

9     brief synopsis, do you remember what, if

10    anything, you said?

11         A       I just said that Ms. Hinton was

12    having some problems with the officers and

13    they wouldn't go into the room and that's why

14    I called.

15         Q       Okay.  What did she say?

16         A       She said she's going to go down

17    there and talk to them.

18         Q       Okay.  Did Mr. Hinton say anything

19    over the phone to --

20         A       No.

21         Q       -- Ms. O'Connell?

22         A       No.

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

+ + + + +

```
------------------------+
                        |
DONALD RAY HINTON,      |
                        |
        Plaintiff,      |
                        |
     v.                 |   Case No.
                        |   1:07-CV-00807
DISTRICT OF COLUMBIA,   |
et al.                  |
                        |
        Defendants.     |
                        |
------------------------+
```

Thursday,
January 17, 2008
Washington, D.C.

DEPOSITION OF:

JUDITH O'CONNELL

called for examination by counsel for the
Defendants, pursuant to notice of deposition,
in the Office of the Attorney General, 441 4th
Street, NW, when were present on behalf of the
respective parties:

25

1          Q     Okay.  He returned, I guess, back

2     up the hall?

3          A     Right.  To get something, and then

4     he was coming back down to go into another

5     patient's room.

6          Q     Okay.  So, when you began talking

7     to the officers, it was just you talking to

8     them at first?  Is that correct?

9          A     Correct, to the officer, yes.

10         Q     After the officers became -- it's

11    your testimony that the officers became loud?

12         A     Yes.  That particular officer.

13         Q     The one in 527?

14         A     Correct.

15         Q     Okay.  It's your testimony that

16    she said, "Don't point at me?"

17         A     Correct.

18         Q     That's the time that Mr. Hinton

19    came back down the hall?

20         A     He appeared back in the vicinity

21    where I was with the officer, yes.

22         Q     Okay.  You said that he said

1    something?

2        A    Yes.

3        Q    But you don't remember what he

4    said?

5        A    I do not recall what he said.

6        Q    Even though you don't remember the

7    content of what he said, how did he say it?

8        A    He was not loud.  He was not

9    threatening.  He was just verbalizing and I

10   don't know -- like I said, I don't recall

11   exactly what the words were, but --

12       Q    Okay.  I understand that you don't

13   remember the exact words.

14       A    Right.

15       Q    What was the jest of what he was

16   saying to the officer?

17       A    I'm not sure if it had to do with

18   the earlier incident that had occurred.  I'm

19   not really sure.  I don't -- like I said, I

20   don't recall the exact -- I know voices became

21   escalated, patients were now standing out

22   there looking at what was going on.  Other

1    staff members came down.

2         Q    Okay.  You referred to an incident

3    that happened before you came on the scene --

4         A    Correct.

5         Q    What, if any, knowledge at that

6    time did you know about that previous

7    incident?

8         A    All I was told is that officers

9    were eating in the hallway.

10        Q    Okay.  Who told you that?

11        A    That was  Ms. Alsobrooks  and

12   Mr. Hinton also.  Both told me that.

13        Q    So, just to back up, you received

14   a call from Ms. Alsobrooks --

15        A    Correct.

16        Q    -- to come upstairs?

17        A    Correct.

18        Q    During that phone conversation,

19   what, if anything, did she say to you?

20        A    Well, at that time, she said that

21   the officers wanted to see me.

22        Q    Okay.

1    directly to him?  Any of the officers?

2         A    He was talking to the shorter

3    officer that was next to me.  I don't recall

4    her saying anything to him.  I then asked the

5    other nurses, Ms. Alsobrooks, to try and get

6    Mr. Hinton down the hall so that we wouldn't

7    have any more exchange of conversation.

8         Q    Okay.  So, just to be clear, it's

9    your testimony that nobody was speaking to

10   Mr. Hinton before he started talking in the

11   conversation that you just had?

12        A    Not that I can recall.

13        Q    Okay.  He was talking to the

14   shorter --

15        A    Yes.

16        Q    Okay.  Why did you ask other

17   nurses to take Mr. Hinton down the hall?

18        A    Because I didn't -- they were --

19   the officer was talking back to him and she

20   told him she was going to arrest him.

21        Q    Okay.  What exactly did she say?

22   Can you remember?

1    A    Exact words?  No.

2    Q    Okay.  But, the gist of what she

3    was saying was what?

4    A    She was going to arrest him if he

5    didn't shut up.

6    Q    Okay.  She was going to arrest him

7    if he did not shut up?

8    A    Correct.

9    Q    Okay.  What is the other officer

10    doing at this time?

11    A    She was just in the doorway of 29,

12    529.

13    Q    What were you saying, if anything,

14    during this time?

15    A    I was trying to ask the officer to

16    wait until our security guards came up before

17    she did anything.

18    Q    I'm sorry.  You were talking to

19    the officer --

20    A    Officer, the short officer.

21    Q    Okay.  That's the one in 527?

22    A    Correct.

# EXHIBIT D

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

DONALD RAY HINTON )
    Plaintiff )
  )
    v. )    Case No.: 1:07-cv-00807
  )
THE DISTRICT OF COLUMBIA, *et al.* )
  )
    Defendants )
_____ )

## PLAINTIFF'S ANSWERS TO DEFENDANT'S INTERROGATORIES

A.    The following Answers to Interrogatories include, as requested, knowledge and information not only of the persons signing these Answers but of agents, representatives, and, unless privileged, the attorney of the person signing such Answers.

B.    The phrasing of the Answers to Interrogatories is not necessarily that of the person signing the Answers but is, in some cases, the phrasing of the persons mentioned in Paragraph A, above.

C.    These Answers to Interrogatories furnish knowledge, facts and information presently available, and, as requested, if subsequent or different information is obtained before trial, these Answers will be appropriately supplemented, either formally or informally by communicating the information to all parties. Accordingly, the party answering these Interrogatories, by providing them information requested, does not waive objections to its admission in evidence on grounds of materiality or relevancy or other proper grounds for objection.

D.    The word usage and sentence structure may be that of the attorney assisting in the preparation of these Answers, and thus, does not necessarily purport to be the precise language of the executing party.

tests, diagnosis, course and dates of treatment, course of treatment, date you

reached an endpoint, and when and whether you have been released from care.

Answer No. 12:    Plaintiff objects to this interrogatory as it seeks

information protected by doctor/patient privilege.  Without waiving any objection,

Plaintiff states that he has not been treated as of this date and will supplement this

answer if he does seek such treatment.

13.    Itemize all medical, hospital, doctor, physical therapy, health care

provider and counseling bills and expenses, lost wages and earnings, and any other

past or future losses, expenses, and other out-of-pocket payments attributable to the

event.

Answer No. 13:    GSECH -$6520.00; $2,029.00 - Afolabi Martins, DDS,

Lost Wages from GSECH, and Lost Wages from Hadley Memorial Hospital.

14.    Describe in detail the basis of your claim that the District of Columbia

and Officers Nowlin and Slaughter violated your civil rights under 42 U.S.C.§ 1983,

as alleged in Count VI of your complaint including but limited to the factual support

you intend to introduce to prove this claim, the evidence of the custom or practice of

the District of Columbia that violated your civil rights, the witnesses you intend to call

to support this claim and the substance of their likely testimony, and the exhibits that

you intend to introduce to support these claims. Attach all documents related to this

interrogatory.

Answer No. 14:    Plaintiff objects to this Interrogatory to the extent it

seeks information obtained under the attorney client privilege, work product doctrine,

seeks a legal conclusion and information obtained in the anticipation of litigation.

13

Without waiving any objection, the facts that support this claim are in clearly spelled out in the Complaint, my deposition and Answer No. 7 to Defendant's interrogatories. Defendants are in possession of the documents referred to.

15.    Describe in detail the basis of your claim that the District of Columbia and Officers Nowlin and Slaughter falsely imprisoned you, as alleged in Counts IV-VI of your complaint, including but limited to the factual support you intend to introduce to prove this claim, the evidence to support your claim that you were falsely imprisoned, the witnesses you intend to call to support this claim and the substance of their likely testimony and the exhibits that you intend to introduce to support these claims. Attach all documents related to this interrogatory.

Answer No. 15:    Plaintiff objects to this Interrogatory to the extent it seeks information obtained under the attorney client privilege, work product doctrine, seeks a legal conclusion and information obtained in the anticipation of litigation. Without waiving any objection, and in addition to the above answers, I was locked-up without justification.  The charges were dismissed by the U.S. Attorney when I was brought before a judge subsequent to the unlawful vindictive arrest and unlawful detention by Defendants. Defendants insisted in pursuing the frivolous and malicious prosecution of the criminal charges after they were dismissed by the U.S. Attorney and they were subsequently dismissed for a second time. See Answer No. 7 and the transcript of my deposition which clearly supports my claims.

16.    Describe in detail the basis of your claim that the District of Columbia and Officers Nowlin and Slaughter falsely arrested you, as alleged in Counts I-III of

14

I DO SOLEMNLY declare and affirm under penalties of perjury that the matters and facts contained herein are true and correct to the best of my personal knowledge.

Donald Hinton

**LOUIS FIREISON & ASSOCIATES, P.A.**

By: _____
Louis Fireison  #103424
4550 Montgomery Avenue
Suite 910N
Bethesda, Maryland 20814
(301) 652-7500

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 28th day of December 2007, a copy of the foregoing was mailed, postage prepaid, addressed to:

Michael Bruckheim, Esquire
Assistant Attorney General
Office of the Attorney General
441 4th Street, NW,
6th Floor North
Washington, DC 20001

_____
Louis Fireison