**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DONALD RAY HINTON | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No.: 1:07-cv-00807 |
| | ) | |
| THE DISTRICT OF COLUMBIA et al. | ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |

## OPPOSITION TO DEFENDANTS' PARTIAL MOTION FOR SUMMARY JUDGMENT

Plaintiff, Donald Ray Hinton (hereinafter "Plaintiff"), by and through his attorneys, Louis Fireison, Esquire, Patricia H. Ley, Esquire, and Louis Fireison & Associates, P.A., hereby opposes Defendants' Partial Motion for Summary Judgment and for the reasons therefore states:

1) There are genuine issues of material facts in dispute

2) Defendants are not entitled to judgment as a matter of law.

A memorandum of points and authorities is attached hereto in support of this opposition.

Wherefore, Plaintiff respectfully requests that Defendants' Partial Motion for Summary Judgment be denied.

Respectfully submitted,

**LOUIS FIREISON & ASSOCIATES, P.A.**

By**:**     /s/ Louis Fireison
           Louis Fireison, #103424

By**:**     /s/ Patricia H. Ley
           Patricia H. Ley, MD #17181
           4550 Montgomery Avenue
           Suite 910N
           Bethesda, Maryland  20814-3344
           (301) 652-7500
           Attorneys for Plaintiff

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

DONALD RAY HINTON                    )
                                     )
        Plaintiff                    )
                                     )
        v.                           )        Case No.: 1:07-cv-00807
                                     )
THE DISTRICT OF COLUMBIA et al.      )
                                     )
        Defendants                   )
_____)

## STATEMENT OF GENUINE ISSUES OF MATERIAL FACTS IN DISPUTE

In support of Plaintiff's Opposition to Defendant's Partial Motion for Summary Judgment, Plaintiff hereby submits his Statement of Genuine Issues of Material Facts in Dispute, and states as follows:

1.      Facts support that Officer Nowlin was inadequately trained, supervised and disciplined by MPD.  *See* deposition of Nowlin at 14-15, 21-22, 29, 45 (Exhibit 6); Plaintiff's Supplemental Request for Admissions (Exhibit 7).

2.      Facts support that Officer Slaughter was inadequately trained, supervised and disciplined by MPD.  *See* deposition of Officer Slaughter at 12, 15, 46-47, 52 (Exhibit 5); Plaintiff's Supplemental Request for Admissions (Exhibit 7).

3.      Aside from receiving a general order, Officer Nowlin never received any training on the guarding of prisoners in hospitals.  *See* deposition of Officer Nowlin at 15, (Exhibit 6).

4.      Aside from receiving a general order, Officer Slaughter never received any training on the guarding of prisoners in hospitals.  *See* deposition of Officer Slaughter at 15 (Exhibit 5).

-1-

5.    Officer Nowlin was negligent in the way she performed her duties while assigned to guard the prisoner in room 529 on May 6, 2006 and failed to follow MPD regulations and GSECH regulations relating to guarding of prisoners.   *See* deposition of Officer Nowlin at 26, 29 (Exhibit 6), MPD Administrative TT (Exhibit 9), GSECH policies (Exhibit 10).

6.    Officer Slaughter was negligent in the way she performed her duties while assigned to guard patient in room 529 on May 6, 2006 and failed to follow MPD regulations and GSECH regulations relating to guarding of prisoners. *See* deposition of Officer Slaughter at 18, 28-30 (Exhibit 5), MPD Administrative TT (Exhibit 9), GSECH policies (Exhibit 10).

7.    The patient in room 529 was not handcuffed or in any way secured as required under police policy and procedure and GSECH policy for guarding a patient under custody.  *See* deposition of Hinton at 28, Hinton's answers to interrogatories at 6, deposition of Officer Nowlin at 26, deposition of Officer Slaughter at 29, MPD Administrative TT (Exhibit 9), GSECH policies (Exhibit 10, page 2).

8.    Officers Nowlin and Slaughter did not follow standard police policy and procedure and GSECH policy while guarding the patient in room 529 as they were not in the room or doorway to room 529.  *See* deposition of O'Connell at 22 (Exhibit 3),deposition of Officer Slaughter at 28, 30 (Exhibit 5), MPD General Order 502.07 (Exhibit 11), GSECH policies (Exhibit 10).

9.    Officers Nowlin and Slaughter failed to sign in with the hospital security desk as required by GSECH standard police policy and procedure.  *See* deposition of

Officer Nowlin at 29 (Exhibit 6), deposition of Officer Slaughter at 18 (Exhibit 5),

GSECH policy (Exhibit 10).

      10.     Officers Nowlin and Slaughter did not comply with Mr. Hinton's request

to move the tables and chairs back in to room 529.  *See* deposition of Officer Nowlin

at 47 (Exhibit 6), deposition fo Officer Slaughter at 34 (Exhibit 5), deposition of Ms.

Alsobrooks at 24 (Exhibit 2).

                    Respectfully submitted,

                    **LOUIS FIREISON & ASSOCIATES, P.A.**

                    By**:**     /s/ Louis Fireison
                          Louis Fireison, #103424

                    By**:**     /s/ Patricia H. Ley
                          Patricia H. Ley, MD #17181
                          4550 Montgomery Avenue
                          Suite 910N
                          Bethesda, Maryland  20814-3344
                          (301) 652-7500

                          Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

DONALD RAY HINTON                    )
                                     )
        Plaintiff                    )
                                     )
        v.                           )        Case No.: 1:07-cv-00807
                                     )
THE DISTRICT OF COLUMBIA et al.      )
                                     )
        Defendants                   )
_____     )

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S OPPOSITION
## TO DEFENDANTS' PARTIAL MOTION FOR SUMMARY JUDGMENT

Plaintiff, Donald Ray Hinton (hereinafter "Plaintiff"), by and through his

attorneys, Louis Fireison, Esquire, Patricia H. Ley, Esquire, and Louis Fireison &

Associates, P.A., hereby submits a Memorandum in Support of Plaintiff's Opposition

to  Defendants' Partial Motion for Summary Judgment.

### STATEMENT OF FACTS

On May 6, 2006, Donald Hinton ("Plaintiff") was on duty at the Greater

Southeast Community Hospital ("GSECH") in the capacity of a registered nurse

assigned to the cardiac unit.  On that date, as he proceeded down the hallway to

assess his patients, he noticed two District of Columbia police officers on their

cellular phones, reading magazines, eating and drinking beverages in the hallway

with chairs and tables.  (Exhibit 1, page 6; Exhibit 5, page 30, 31).

Plaintiff walked past the two police officers, who later became identified as

Officer Nowlin and Officer Slaughter ("Defendants"), greeted them "good morning,"

and entered room 529 to assess the patient, whom was the patient that Defendants

were assigned to guard.  While assessing the patient, Plaintiff noticed that neither the

-1-

upper or lower extremities of the patient was cuffed.  After exiting room 529, Plaintiff asked the officers to remove the tables and chairs that Defendants were occupying in the hallway because it was a safety hazard and fire code violation.  At this point, Defendants became uncooperative, threatening to have Plaintiff arrested if he did not continue on with his business.  Plaintiff then went to get assistance from the charge nurse. (Exhibit 1, page 6).

Subsequently, the charge nurse went down the hallway and advised the two officers that they needed to move their equipment and themselves back into the room. After the officers moved the furniture back into the room, they came back out of the  room and stood in the hallway, in front of room 527.  Plaintiff began telling the officers that they needed to be in the room with the patient that they are assigned to guard.  At this point, one of the officers told Plaintiff , "you better get down the hall or I'll lock your ass up."  The charge nurse then asked Plaintiff to go down the hall with her and called the nursing supervisor.  (Exhibit 2, pages 22-29).

Once the nursing supervisor arrived on the scene, one officer was standing in the doorway of room 529 while the other officer was standing in the doorway of room 527.  The nursing supervisor asked that the officers not to carry on a conversation across the hall to each other and indicated that they needed to be inside the room of the patient that they were guarding.  One of the officers became loud and stated that she was not going in the room, as the patient had bugs.  She also told the nursing supervisor to stop pointing at her.  During the nursing supervisor's interaction with Defendants, Plaintiff was assessing his other patients, which required him to pass rooms 529 and 527 while walking up and down the hall.  (Exhibit 3, pages 22-26)

-2-

At one point while Plaintiff was passing by the nursing supervisor and the two officers were yelling at the nursing supervisor, Plaintiff stopped to intervene.   He took the nursing supervisor by the arm and indicated that they should go back up the hall. One of the officers then grabbed Plaintiff by the arm and placed him under arrest.  He asked why he was being  arrested and tried to turn around.  (Exhibit 4, pages 63-64). One of the officers, if not both, then threw Plaintiff up against the wall, he was handcuffed, his legs were kicked  apart, he was elbowed or kneed in the back and he was placed under arrest.  The nursing supervisor inquired as to why he was being arrested and asked the officers not do anything until hospital security arrived. Notwithstanding the nursing supervisor's request, the officers proceeded with the arrest and placed Plaintiff in a separate room.  (Exhibit 4, page 66; Exhibit 3, pages 39-43).

Plaintiff was subsequently charged with Assault on a Police Officer and Disorderly Conduct.  While arrested at GSECH, Plaintiff began experiencing chest pains and he was taken to the emergency room while still in handcufffs.  Plaintiff was admitted into the Intensive Care Unit and released the following morning.  (Exhibit 1, page 7, 8).

Upon release from the hospital, Plaintiff was transported to the police station and held in a cell with about ten other people overnight.  The next morning, Plaintiff was placed in a paddy wagon to be transported to another location, where he began experiencing chest pains again due to claustrophobia.  He was returned to the lock-up where he tried to explain his condition, but none of the officers cared to take him seriously.  Plaintiff was ultimately thrown into a cell, after being slammed up against a

wall, hitting his head and losing two of his teeth.  (Exhibit 1, page 9).

Plaintiff was finally brought before a woman who he believes was a judge.  His charges were read to her and she stated, "no paper."  However, he was brought back to the holding area as the officer indicated that there were other charges pending against him.  He was ultimately released late Monday evening after being brought before another judge.  (Exhibit 1, page 10).  As a result of this incident, Plaintiff was hospitalized for one night and spent the next two nights in a holding cell under the custody of MPD.  Plaintiff continues to suffer severe emotional trauma and distress.  He experiences sleeplessness and has a fear of being locked-up and confined in a small cell or paddy wagon, causing him additional stress and anxiety.  (Exhibit 4, pages 111-119).

## APPLICABLE LEGAL STANDARDS

When courts analyze a motion for summary judgment, the purpose is not to judge the case based on its merits, but to determine whether any genuine issues of material facts are in dispute and whether the moving party is entitled to judgment as a matter of law.  Fed.R.Civ P. 56(c).  If a court, upon review of the "pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any," finds there is no genuine issue of material facts in dispute and that the moving party is entitled to judgment as a matter of law, the court shall award summary judgment to the moving party.  Fed.R.Civ.P. 56(c).

"A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth."  *S.E.C. v. Seaboard Corp.,* 677 F.2d 1301, 1306 (9th Cir.1982).  Material facts are defined

by substantive law.  As such, "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When determining whether summary judgment is appropriate, the evidence is viewed in the light most favorable to the non-moving party and all reasonable inferences are to be drawn in favor of the non-moving party.  *Id.*  The burden is on the  moving party to make a showing that sufficient ground for summary judgment exists.  *Adickes v. S.H. Kress & Co., I398 U.S.144 (1970).*  The burden then shifts to the non-moving party to show that genuine issues of material facts are in dispute by providing specific facts showing there is a genuine issue for a trier of fact to resolve.  *Berg. v. Kincheloe,* 794 F.2d 457, 459 (9th Cir. 1986).

The standard for summary judgment "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict."  *Anderson*, 477 U.S. at 250 (citing *Brady v. Southern R. Co.,* 320 U.S. 476 (1943)).  Thus, if reasonable minds could differ as to any material conclusion to be drawn based upon the evidence presented, summary judgment should not be granted*.  Id.* at 250, 251 (citing *Wilkerson v. McCarthy,* 336 U.S. 53, 62 (1949)).

## ARGUMENT

### I.    Summary Judgment must be denied because there are genuine issues of material facts in dispute.

Defendants' Partial Motion for Summary Judgment requests that summary

judgment be awarded for Count XX of Plaintiff's Complaint, §1983 action against the District of Columbia; Count XIX of Plaintiff's Complaint, Negligent Training and Supervision, and Counts XVI, XVII and XVIII of Plaintiff's Complaint, Negligent Infliction of Emotional Distress against the three separate defendants.

### A) Count XX, District of Columbia's §1983 violation

As to Count XX of Plaintiff's complaint alleging a §1983 violation against the District of Columbia, there are genuine issues of material fact in dispute. Defendants' claim that Plaintiff "has done nothing more than allege that the District is liable for the 'intentional conduct...perpetrated by the agents and employees...within the scope of their employment.'" However, evidence of the Metropolitan Police Department's ("MPD") lack of training and supervision of its officers was adduced during discovery, which clearly supports Plaintiff's contention that the District of Columbia is liable under §1983.

During the deposition of Officer Slaughter, she was asked, "Now, have you received any training at all in dealing with health care facilities, such as going to a health care facility, guarding of prisoners, anything relating to health care facilities?" She answered, "That's standard in our general orders, so its nothing that we, per se, go over." Next question, "So you have never received any training at all, is that correct?" She answered, "correct." (Exhibit 5, page 12)

During the deposition of Officer Nowlin, she was asked, "You never received any formal training. Is that correct?" She replied, "Handwritten, that's it." (Exhibit 6, page 15).

Furthermore, MPD did not even conduct an internal affairs investigation to

investigate the conduct of the officers involved in this matter, (Exhibit 5, page 46, 47; Exhibit 6, page 45).  No Force Investigation Team unit investigation was conducted either, as required by MPD regulations. (Exhibit 7).

Additionally, Plaintiff has previously noted an expert who will be testifying to issues regarding Police Departments' Conduct, National Standards of Care and issues regarding the violation of an individual's civil rights.  (Exhibit 8).  Therefore, evidence does exist to support a finding that MPD is liable under §1983 and Count XX of Plaintiff's complaint must survive summary judgment.

### B) Count XIX, Negligent training and supervision

As to Count XIX of Plaintiff's complaint alleging negligent training and supervision, there are also genuine issues of material fact in dispute.  Defendants' argue that Plaintiff has failed to produce any factual evidence to support this claim. More specifically, Defendants allege that Plaintiff has failed to establish, by expert testimony, the appropriate standard of care for police.

To the contrary, Plaintiff previously identified James Bradley, retired Detective of the Metropolitan Police Department after twenty-five years of service, as an expert who will be testifying to MPD police procedures and protocols.  (Exhibit 8). Defendants have been aware of Plaintiff's expert and they have failed to conduct any discovery relating to any of his opinions. A report has been provided to Defendants.

### C) Counts XVI, XVII, and XVIII, Negligent infliction of emotional distress

As to Counts XVI, XVII and XVIII of Plaintiff's complaint alleging negligent infliction of emotional distress, there are genuine issues of material fact in dispute that requires a trier of fact to resolve. Defendants claim "there is simply no evidence

on the record that either defendant acted negligently," and as such, they are entitled to summary judgment on this claim.  However, there is evidence supporting that defendants have acted negligently.  As previously indicated,  evidence exists as to MPD's negligent training and supervision of its officers.   (Exhibit 5, page 12, 46, 27; Exhibit 6, page 15, 45; Exhibit, page 7).  Additionally, the conduct of Officers Nowlin and Slaughter provides a basis for a reasonable juror to find that defendants acted negligently.  Furthermore, while Plaintiff was being transported and held in different holding cells, MPD officers were negligent in the way Plaintiff was handled, such as throwing him in a cell causing him to lose two teeth.  (Exhibit 1, page 7-9).

**II.    Summary Judgment must be denied because Defendants are not entitled to   judgment as a matter of law.**

**A)    The District is liable under §1983 as its failure to adequately train and supervise its employees amounts to a deliberate indifference towards the constitutional rights of persons in its domain**

While generally it is true that a municipality may not be held liable for a §1983 constitutional violation under a principal of *respondeat superior*, a municipality is liable for a §1983 action where it is the municipality's own policy or custom that inflicts the injury.  *Robinson v. District of Columbia, et al.,* 403 F.Supp.2d 39 (2005).  As such liability may exist, a municipality is considered a "person" under §1983 for purposes of those liable for the deprivation of a plaintiff's constitutional right.  *Monell v. Dept. of Social Services,* 436 U.S. 658, 689 (1978).  Furthermore, a municipality's failure to train, supervise or discipline city employees can constitute a policy of custom giving rise to potential municipal liability under §1983, if that failure amounts

-8-

to the municipality's "deliberate indifference towards the constitutional rights of persons in its domain." *Deskalea v. District of Columbia,* 227 F.3d 433, 441 (D.C. Cir. 2000).

"Deliberate indifference" is measured objectively and when determining whether the threshold for deliberate indifference has been met, courts analyze whether the "municipality knew or should have known of the risk of constitutional violations, and yet failed to respond as necessary." *Robinson,* 403 F.Supp.2d at 53. Making this showing requires more than showing just simple negligence; it requires a plaintiff to show that such negligence was conscious, or at least reckless. *Id.* at 53, 54 (citing *City of Canton v. Harris,* 489 U.S. 378, 389 (1989)).

Contrary to Defendants' argument, the District is not entitled to judgment as a matter of law on Plaintiff's constitutional claims under §1983. As indicated above, there is evidence in the record that clearly supports a finding that MPD failed to adequately train and supervise its officers. Officers Nowlin and Slaughter refused to comply with the requests of hospital personnel even though such requests were made pursuant to GSECH standard policy and procedures. (Exhibit 1, pages 6-7; Exhibit 10). They failed to keep a watch on the patient in room 529 at all times as required by MPD administrative teletype and GSECH policy; they were reading magazines, talking on their cellular phones, eating and drinking in the hallways causing a fire hazard and most importantly, failed to keep the patient in room 529 secured. (Exhibit 1, page 6; Exhibit 1, page 22; Exhibit 9; Exhibit 10).

Further, even subsequent to the filing of this claim, there is evidence illustrating that MPD did not conduct any type of investigation into the officers'

conduct arising out of this incident and no evidence has been produced to date that such investigation has been conducted. It is quite clear that the actions of the District is one of indifference to its citizens. The District has clearly acted with deliberate indifference towards plaintiff's constitutional rights. This type of action or inaction by MPD is the very type that attaches §1983 liability to a municipality. Although Plaintiff does not suggest that MPD has a policy in place requiring its officers to assault and batter, falsely arrest, falsely imprison and or maliciously prosecute, the failure of investigating an officer's conduct where such incidents are alleged amounts to turning a blind eye. *See City of Canton v. Harris*, 489 U.S. at 379 (holding that "the inadequacy of police training may serve as the basis for §1983 liability only where the failure to train in a relevant respect amounts to deliberate indifference to the constitutional rights of persons with whom the police come into contact"); *see also Board of the County Commissioners of Bryan County, Oklahoma v. Brown,* 520 U.S.397, 403-404 (stating that "an act performed pursuant to a custom that has not been formally approved by an appropriate decision maker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law"), *Carter v. District of Columbia,* 795 F.2d 116 (D.C.1986) ("a municipality's failure to adequately train, supervise, investigate and discipline police officers can give rise to municipal liability if that failure represents city policy and deliberate indifference).

In the instant matter before the court, Officers Nowlin and Slaughter were not even called in for questioning, even after MPD was placed on notice of their misconduct and the subsequent dismissal of the false and malicious criminal

charges.  The District has clearly done nothing to make sure that their officers do not engage in unconstitutional acts.  The officers were not sanctioned, disciplined or even questioned about their behavior.  Whether or not MPD's intentional ignorance of its officers' conduct amounts to deliberate indifference as to constitute a policy must survive summary judgment and be a question for the trier of fact to determine.

    **B)**    **Plaintiff's claim under negligent training and supervision survives summary judgment**

Expert testimony is not required in every negligence action.  More specifically, "proof of a deviation from the proper standard of care does not require expert testimony where the events from which the negligence arose are 'within the realm of common knowledge and everyday experience.'" *District of Columbia v. White,* 442 a.2d 159, 164 (1981) (quoting *Matthews v. District of Columbia,* 387 A.2d 731, 734-735 (1978)).  Expert testimony is only required when jurors are presented with a subject that is "so distinctly related to some science, profession, or occupation as to be beyond the ken of the average lay person."  *Daskalea,* 227 F.3d 433 (quoting *District of Columbia v. Peters,* 527 A.2d 1269, 1279 (D.C. 1987)).

While it is true that expert testimony has been required in many cases involving police officers' conduct and the police departments negligent training and supervision, those cases that do require expert testimony focus on technical issues, where common sense would not allow a reasonable juror to make an accurate determination of the issues without the additional assistance of an expert.   For example, in *District of Columbia v. White,* 442 A.2d 159 (1982), an expert was required to testify regarding adequate weapons safety training and evaluation; in

*District of Columbia v. Carmichael*, 577 A.2d 312 (D.C.1990), expert testimony regarding the ramifications of prison security was necessary and in *Toy v. District of Columbia,* 549 A.2d 1 (D.C.1988)*,* expert testimony was necessary to establish the standard of care for the administration of cardiopulmonary resuscitation. *See also Hughes v. District of Columbia,* 425 A.2d 1299 (D.C.1981) (indicating that the inmate security is not a subject within the realm of the everyday experiences of a lay person).

However, in cases where a juror could simply use common sense to determine whether or not a police department was negligent in supervising, training or disciplining its officers for unconstitutional acts committed against a citizen, expert testimony is not necessary, even if it may be helpful.  For example, in *Daskalea,* the District of Columbia and the Department of Corrections were held liable under §1983 as it was found that the District acted with deliberate indifference towards plaintiff's constitutional rights.  The case involved a District of Columbia jail inmate who was forced to perform a striptease in front of prisoners and correctional guards. The plaintiff sued the District for §1983 violations and common law negligent supervision and intentional infliction of emotional distress.  In the record, there was evidence that eight officers, ranging from corporals to lieutenants, had been negligent, and that the misconduct occurred due to poorly trained supervisors. The court stated:

> [I]t does not take an expert to establish that the District was negligent in permitting the kind of persistent, open and notorious conduct at issue here. Surely a reasonable juror could reasonably conclude that the District had been negligent (at best) when it failed to notice, let alone stop, a continuing series of evening stripteases...

227 F.3d 433 at 445.  As with *Daskalea,* an expert is not needed to prove that MPD has

-12-

negligently trained and supervised its officers. Again, when there is evidence that investigations looking into an officers misconduct are not even conducted, common sense would allow any reasonable juror to conclude that MPD was negligent in training and supervising its officers.

Even assuming for the sake of argument that expert testimony is required, Plaintiff previously noted James Bradley as an expert witness who will testify to the national standards of care for police departments and its officers. However, Defendants did not note Mr. Bradley's deposition or conduct any other discovery relating to the designated expert and Plaintiff does not have a duty to "produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not require the non-moving party to depose her own witnesses." *Celotex Corp. v. Catrett,* 477 U.S. 317 , 324 (1986).

### C)    Plaintiff's claims under negligent infliction of emotional distress survives summary judgment

Under District of Columbia law, a plaintiff can recover for negligent infliction of emotional distress if the following elements are met: (1) that the plaintiff suffered either a physical impact or was within the zone of danger of the defendant's actions, (2) that the plaintiff suffered emotional distress that was serious and verifiable, and (3) that the defendant acted negligently. *David v. District of Columbia,* 436 F.Supp.2d 83 (2006).

Plaintiff's negligent infliction of emotional distress is supported by the record so as to preclude the granting of summary judgment. Plaintiff was hospitalized as a result of Defendants' misconduct. Even upon release from the hospital, Plaintiff continued to suffer emotional as well as physical injury. Officers Slaughter and Nowlin were negligent

-13-

in effecting the false arrest and imprisonment of Plaintiff. *See Id.* (concluding that plaintiffs presented sufficient evidence for a jury to reasonably find defendants liable for falsely arresting and imprisoning David, depriving David of constitutional rights and negligently inflicting emotion distress upon both plaintiffs). Furthermore, due to MPD's lack of adequate and/or proper training, supervising and disciplining of its officers, Plaintiff suffered such harm. If officers are disciplined for misconduct, then perhaps the misconduct would stop. However, when officers are not even questioned about their misconduct, plaintiff and similarly situated persons are injured as a result.

Defendants argue that "the gravamen of plaintiff's complaint is that the officers' conduct amounted to assault and battery." That while the record indicates that Officers Nowlin and Slaughter intentionally assaulted and battered Plaintiff, a reasonable juror may conclude that the officers' conduct did not rise to a level of an intentional tort, but rather a negligent act. As such, there are facts that must be presented to a jury for its determination of the occurrence and whether defendants' acts were intentional or negligent.

## CONCLUSION

For the foregoing reasons, Plaintiff Donald Hinton respectfully requests this Honorable Court deny Defendants' Motion for Partial Summary Judgment.

Respectfully submitted,

**LOUIS FIREISON & ASSOCIATES, P.A.**

By**:**    /s/ Louis Fireison
          Louis Fireison, #103424

By**:**    /s/ Patricia H. Ley
          Patricia H. Ley, MD #17181
          4550 Montgomery Avenue
          Suite 910N
          Bethesda, Maryland  20814-3344
          (301) 652-7500

          Attorneys for Plaintiff

-15-

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

DONALD RAY HINTON                      )
                                       )
    Plaintiff                      )
                                       )
    v.                             )     Case No.: 1:07-cv-00807
                                       )
THE DISTRICT OF COLUMBIA, *et al.*     )
                                       )
    Defendants                     )
_____)

## PLAINTIFF'S ANSWERS TO DEFENDANT'S INTERROGATORIES

    A.    The following Answers to Interrogatories include, as requested, knowledge and information not only of the persons signing these Answers but of agents, representatives, and, unless privileged, the attorney of the person signing such Answers.

    B.    The phrasing of the Answers to Interrogatories is not necessarily that of the person signing the Answers but is, in some cases, the phrasing of the persons mentioned in Paragraph A, above.

    C.    These Answers to Interrogatories furnish knowledge, facts and information presently available, and, as requested, if subsequent or different information is obtained before trial, these Answers will be appropriately supplemented, either formally or informally by communicating the information to all parties.  Accordingly, the party answering these Interrogatories, by providing them information requested, does not waive objections to its admission in evidence on grounds of materiality or relevancy or other proper grounds for objection.

    D.    The word usage and sentence structure may be that of the attorney assisting in the preparation of these Answers, and thus, does not necessarily purport to be the precise language of the executing party.

what each person said and to whom each statement was made (if you do not recall

exact wording, state the content of such statement), the exact wording of all

statements made by yourself, and the identity of the person to whom said statements

were made, your physical movements and the time that each of the above actions

and/or statements occurred).

Answer No. 7:        I arrived at work at approximately 6:30 a.m. and  received

a report from co-workers on the previous shift . I started down the hall to assess my

assigned patients, when I noticed two District of Columbia police officers in the

hallway with chairs and tables.  The officers were on their cell phones, reading

magazines and drinking beverages.  I said "good morning".  After passing where the

officers were, I went into room 529 to assess the patient.  I noticed that the neither

the upper or lower extremities of the  patient was cuffed. I asked the officers if they

could move the tables and chairs out of the hallway because it was a Fire Code and

JCAH Violation. I further indicated that the hospital could be fined $10,000.00 and

that I could be fired because I was responsible for the patient they were watching.

Both officers looked at me, the lighter complexioned of the two officer stood up and

stated, "you better take your ass up the hall before I arrest your ass."  She placed

one hand on her hip and the other hand on her weapon in a threatening manner.  I

went back to the front desk to speak with my charge nurse to ask her if the policy had

changed regarding the officers being in the hallway on cell phones and moving

furniture and prisoners not being handcuffed.  I also told her about the officer telling

me to take my ass back up the hall.  She stated that the policy had not changed and

called security and the nursing supervisor.  The charge nurse asked the officers to

6

move the table and chairs out of the hallway, which they refused. The nursing supervisor arrived on the unit and advised the officers that they were not supposed to be in the hallway and should be with the prisoner. The officers started shouting at the nursing supervisor indicating that they are not going back into the room.

At that time, the darker complexioned of the two officers grabbed my right arm and stated, "you are not going anywhere, you are under arrest." The female officer pushed me up against the wall with her elbow or something that was hard pressing my lower back. The supervisor yelled, "what are you doing? You have no right..." The other officer intervened grabbing at the supervisor, stating, "stand back or you will be placed under arrest." I turned to the right, asking, "why am I under arrest?" At the same time, I heard from a police radio "man with a gun..." I was placed in room 527 and another officer came in the room to get a statement from me. He stated that "Everything is going to be alright."

Someone asked where is the gun and a female voice stated, "it looked like he had something under his shirt." I indicated to the officer that the handcuffs were too tight and she responded that if she could get her finger in there, they were not too tight. The Officer continued jerking and pulling the handcuffs in a threatening manner.

After being taken to the lobby of the hospital in handcuffs, I waited for police transportation. As I was placed in the wagon, I was directed to a small crawl space. I became anxious and experienced excruciating diaphragmatic chest pains. I told the officer my chest was hurting and I was very claustrophobic. I was taken to the emergency room at the hospital. Upon entering the emergency room, the male

7

officer yelled "man with chest pain!" I was placed on a stretcher and on cardiac monitors. (Various administrators of the hospital arrived in the ER and were outraged to see that the officers had arrested a staff member)

I was subsequently assigned a bed in the intensive care unit. Mrs. Veronica Hill, a co-worker, pushed me to ICU on the 4th floor. Two officers trailed behind her. While being monitored in ICU, various officers asked what happened. I asked if they would loosen the hand cuffs just a little; that they did. The officers then began telling me that the longer I stayed there, the longer it would be before I was released. I was released Sunday morning from the hospital at my own request.

When the officers arranged for transport, I stated to the female officer that I was claustrophobic and could not be placed in a Paddy Wagon. She arranged for a car to transport me to 7D. I was placed in a long cell with about ten other people. People began complaining about large amounts of vomit on the cell floor. An officer came back in and shouted, "shut the hell up back here." All throughout the night, verbal abuse was given to different people, after complaints were made about sandwiches. Monday morning they released us to be transported to another location. While being transported, I explained that I was claustrophobic. While being placed in the patty wagon, I again began to have chest pains. I was the first to step up in the wagon. After sitting in the wagon for a few minutes, I again became short of breath and stood up in the van. An officer who appeared to be of Jamaican descent began cursing and shouted, "You stupid mother fucker, what's your damn problem, get your Black ass back in the fucking wagon. You're going to make me late, bitching." The officer standing at the wagon looked at the "Jamaican" officer as if he wanted him to

8

be quiet. I was returned to the lock-up. I explained that I had pain and asked if they would give me the pill. They told me they would when I was processed. Then the ""Jamaican" officer said, "we don't give fucking medicine here." He told the lady officer to put me back. I explained to the lady officer that I could not go into a small cell because I was claustrophobic. She said, "into the cell." I refused and three other officers grabbed me and began to push and shove me while I was handcuffed. I propped myself up between the bars of the cell and again stated that I was claustrophobic and that I would have problems breathing if I was closed up in that small cell. They continued to shove me and while they were pushing me, the "Jamaican" officer said, "well put him into the larger cell." They shoved me up against the wall, my head hit the wall and I subsequently lost three teeth. While in the cell, I again asked if I could please have my heart medicine. I started yelling for their help and to call me an ambulance. A lady officer came in the back and said, "everything you do, I can see up front and for somebody with chest pain, you sure did put up a fight not to get in that little cell." I was still short of breath so I laid on the floor. I did not know what happened then. I just remember seeing Hispanic people cleaning the cell out with a mop and water.

I was eventually transported down town to a holding cell. Officers placed me in a large cell. The officers there had different uniforms and wee not physically of verbally abusive. I was called into a room with who I believe to be a judge. My charges were read to her. She stated, "no paper." But I was still brought back to the holding area. I asked the male officer, where I was going and he told me I was going back to my holding area. He told me I had other charges. After waiting to be called,

9

an officer took me to another area in which there were about four other people waiting. I explained to him that I have chest pains and he asked if I wanted to see the nurse. He left for about 5 minutes, returned and stated that all the nurses had gone home for the day. He then stated, "I'll tell you what, you will be next and we will do everything we can to get you out of here." I didn't understand what was going on in front of the judge, but I was released late Monday evening after seeing the Judge. I called a co-worker to come and pick me up on 11th Street at Metro Center.

8.    Identify by name, address and telephone number each witness to the event, (or describe if the identity is unknown), each law enforcement officer (with badge number), companion or associate of yours, any uninvolved witness on the scene, and furnish the exact words (or, if you cannot recall, the content of statements made) and actions taken by each such witness shortly before, during and after the incident.

Answer No. 8:    Plaintiff objects to this interrogatory as it seeks information protected by the attorney client privilege and attorney work product. Without waiving any objection, Lorna Alsonbooks, GSECH, 202-574-6915; Judith O'Connell, GSECH, 202-574-6915; Tanya McDuffie, 202-574-6915; L. Johnson, GSECH, 202-574-6000; Lt. Dorsey, GSECH, 202-574-6667; Jane Link, GSECH, 202-574-6915; Carol Felder, GSECH, 202-574-6915; Pamela Harris, 1901 D Street, S.E., Washington, DC, 301-330-9469; Dougals S. Roeser, 1310 Southeast Avenue, S.E., Washington, DC, 202-574-6966; John Goirs, GSECH, 202-292-5347; Yvonne Moore, GSECH, 202-574-6915; Veronica Hill, 301-292-5861; Alfreda Williams, 202-698-4932; Ethel Turner Evans, 202-425-4252; Dr. Russom Ghebrai, GSECH, Dr. Jon

10

I DO SOLEMNLY declare and affirm under penalties of perjury that the matters and facts contained herein are true and correct to the best of my personal knowledge.

Donald Hinton

**LOUIS FIREISON & ASSOCIATES, P.A.**

By: _____

Louis Fireison #103424
4550 Montgomery Avenue
Suite 910N
Bethesda, Maryland 20814
(301) 652-7500

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 28th day of December 2007, a copy of the foregoing was mailed, postage prepaid, addressed to:

Michael Bruckheim, Esquire
Assistant Attorney General
Office of the Attorney General
441 4th Street, NW,
6th Floor North
Washington, DC 20001

Louis Fireison

22

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

+ + + + +

--------------------------+
                          |
DONALD RAY HINTON,        |
                          |
        Plaintiff,        |
                          |
    v.                    |  Case No.
                          |
                          |  1:07-CV-00807
DISTRICT OF COLUMBIA,     |
et al.                    |
                          |
        Defendants.       |
                          |
--------------------------+

                    Thursday,
                    January 17, 2008
                    Washington, D.C.


DEPOSITION OF:

ALVA L. ALSOBROOKS

called for examination by counsel for the
Defendants, pursuant to notice of deposition,

in the Office of the Attorney General, 441 4th
Street, NW, when were present on behalf of the

respective parties:

2540fe64-385d-46c9-95a4-67bed66d71d5

1    THE WITNESS: -- down the hall. I
2  don't know their names, but two female
3  officers.
4    BY MR. WILLIAMS:
5    Q    Where were they standing or --
6    A    They were sitting outside the
7  patient's room in the hallway.
8    Q    Can you describe each officer?
9    A    They were black. They were young,
10  and slim built, brown skin. I mean, that's
11  basically all I can say about that.
12    Q    Okay. What I'm going to ask you
13  to do is try to give me information that would
14  discern one officer from the other, the
15  characteristics of one officer from the other
16  officer.
17    So, can you -- what are the
18  differences between the officers in the way
19  they looked?
20    A    One of the officers, from what I
21  can recall, was -- to me, she was one that was
22  doing most of the talking.

Page 22

1  complected -- I guess medium brown, you said,
2  individual did most of the talking?
3    A    Yes.
4    Q    So, the shorter, lighter skinned
5  individual did less of the talking.
6    A    Yes. I think that's how it was.
7    Q    Okay. Okay. So, you went down
8  the hall. Which officer did you talk to?
9    A    Both of them.
10    Q    Okay.
11    A    I didn't specify. I just told
12  both of them that this is creating a fire
13  hazard. They need to move their equipment and
14  themselves into the room.
15    Q    Okay. Did any of the officers say
16  anything to you?
17    A    One of the officers, and I think
18  it's the one who was talking most, said,
19  "Okay. Thank you. You were nice, but
20  Mr. Hinton was not very nice."
21    Q    Okay.
22    A    That's what she said.

Page 24

1    Q    What did she look like?
2    A    She was brown skinned. I didn't
3  get her name.
4    Q    Okay.
5    A    Shorter -- brown complexion. She
6  was about 5'4", 5'5" tall.
7    Q    When you say brown complected, if
8  I use the word light skin --
9    A    No.
10    Q    -- is that appropriate?
11    A    Medium brown.
12    Q    The other officer?
13    A    She was a little bit shorter than
14  the first officer and a little lighter
15  complexion than the first one. But this is
16  not very clear. I mean, it's sort of fuzzy
17  right now.
18    Q    Oh, I understand. I'm just asking
19  the best that you remember --
20    A    Okay.
21    Q    -- as sitting here today. I
22  believe your testimony was that the medium

Page 23

1    Q    So, which officer is this again,
2  that said this?
3    A    The one that was talking. Did
4  most of the talking.
5    Q    Did most of the talking. Okay.
6  So, it's your testimony that she said -- did
7  she comply with your request?
8    A    Oh, yes she did. She immediately
9  complied and moved the equipment into the
10  room.
11    Q    Her equipment or her furniture?
12    A    The furniture, yes.
13    Q    Okay. What, if anything, did the
14  other officer say?
15    A    I didn't hear her say anything. I
16  don't recall.
17    Q    What, if anything, did that
18  officer do concerning the furniture?
19    A    No. They complied and moved the
20  furniture into the room.
21    Q    Did the officer say anything else
22  to you?

Page 25

7 (Pages 22 to 25)

2540fe64-385d-46c9-95a4-67bed66d71d5

| 1 | A    Not at that time, no. |
|---|---|
| 2 | Q    At that time, yes. |
| 3 | A    No. |
| 4 | Q    They say anything else to you? |
| 5 | A    No, they did not. |
| 6 | Q    After those officers moved the |
| 7 | furniture into the room, what did they do at |
| 8 | that time? |
| 9 | A    They came out of the room and |
| 10 | stood in the hallway. |
| 11 | Q    Both officers came out of the |
| 12 | room? |
| 13 | A    Both officers came out of the room |
| 14 | and stood in the hallway. |
| 15 | Q    Now, directly in the hallway or in |
| 16 | the doorway? |
| 17 | A    In the hallway.  They were -- |
| 18 | actually, they were at another room, which was |
| 19 | opposite the room that the patient was |
| 20 | assigned.  They were sitting at Room 527, |
| 21 | which is opposite the room that they were |
| 22 | assigned.  They weren't even in the patient's |

Page 26

| 1 | officers that they are supposed to be in the |
|---|---|
| 2 | room with the patient. |
| 3 | Q    Okay.  Let's back up for one |
| 4 | second.  I missed something.  It's not you. |
| 5 | It's me.  When you came down the hallway, did |
| 6 | Mr. Hinton come down the hallway, too? |
| 7 | A    Yes, he did.  Yes, he did. |
| 8 | Q    Okay.  Did he say anything during |
| 9 | this initial time that you just testified to? |
| 10 | A    No, he did not. |
| 11 | Q    Okay.  Where was he standing? |
| 12 | A    He was standing basically beside |
| 13 | me. |
| 14 | Q    Beside you? |
| 15 | A    Uh-hmm. |
| 16 | Q    As you were talking to the |
| 17 | officers? |
| 18 | A    As we were talking to the |
| 19 | officers. |
| 20 | Q    Okay.  Is this -- when's the first |
| 21 | time that he said anything during that |
| 22 | encounter? |

Page 28

| 1 | hallway or anything like that. |
|---|---|
| 2 | Q    So, the patient that they were |
| 3 | supervising or watching over, what room was |
| 4 | that? |
| 5 | A    529. |
| 6 | Q    Okay.  You said 527, they were |
| 7 | standing in front of that room, too? |
| 8 | A    That's right. |
| 9 | Q    That room is directly across? |
| 10 | A    Yes.  Yes. |
| 11 | Q    Who, if anybody, was in that room? |
| 12 | A    Nobody. |
| 13 | Q    Nobody.  It was empty? |
| 14 | A    Correct. |
| 15 | Q    Okay.  So, after they came back in |
| 16 | the hallway, are you still down there with |
| 17 | them? |
| 18 | A    I'm still down there with them. |
| 19 | Q    What, if anything, did you say to |
| 20 | them at that point? |
| 21 | A    At this point, I was not saying |
| 22 | anything, but Mr. Hinton was saying to the |

Page 27

| 1 | A    After I asked him to move the |
|---|---|
| 2 | equipment and they complied, as I was turning |
| 3 | around to go back up the hallway, Mr. Hinton |
| 4 | kept saying, "You all need to be in the room. |
| 5 | You all need to be in the room with the |
| 6 | patient." |
| 7 | The officer said, and I'm not |
| 8 | quoting, just something to this effect, "You |
| 9 | had better get down the hall or I'll lock your |
| 10 | ass up."  That's what she said. |
| 11 | MR. FIREISON:  Or I'll what?  I'm |
| 12 | sorry. |
| 13 | THE WITNESS:  "Or I will lock your |
| 14 | ass up." |
| 15 | MR. FIREISON:  Okay. |
| 16 | BY MR. WILLIAMS: |
| 17 | Q    You heard this as you were walking |
| 18 | away? |
| 19 | A    Yes, and I asked Mr. Hinton, "Come |
| 20 | on down the hall with me.  Just leave it |
| 21 | alone.  We're going to call Ms. O'Connell." |
| 22 | Q    Okay.  Do you know which officer |

Page 29

8 (Pages 26 to 29)

Neal R. Gross and Co., Inc.
202-234-4433

2540fe64-385d-46c9-95a4-67bed66d71d5

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

+ + + + +

------------------------+
DONALD RAY HINTON,      |
                        |
        Plaintiff,      |
                        |
    v.                  |  Case No.
                        |
                        |  1:07-CV-00807
DISTRICT OF COLUMBIA,   |
et al.                  |
                        |
        Defendants.     |
                        |
------------------------+

                        Thursday,
                        January 17, 2008
                        Washington, D.C.

DEPOSITION OF:

JUDITH O'CONNELL

called for examination by counsel for the
Defendants, pursuant to notice of deposition,

in the Office of the Attorney General, 441 4th
Street, NW, when were present on behalf of the

respective parties:

1  officers wanted to speak with me.
2      I went down to the hall, went down
3  the hall to speak to the officers.  There was
4  one officer standing in the doorway of 529.
5  There was another officer standing in the
6  doorway of 527.  The patient that they were
7  with was in 529.
8      I tried to speak with the officer
9  in 527, and she became very loud.  I motioned
10  for her to go into 527.  I asked her if we
11  could step inside there so that we could speak
12  and not be overheard through the hospital.
13  Q    I don't want to stop you because I
14  want you to continue telling the story --
15  A    Okay.
16  Q    -- but, can you identify what the
17  officers looked like?  Who was in the door at
18  529 and who was in 527?
19  A    The officer in 529 was taller and
20  darker.  The one in 527 was short.
21  Q    Was she light skinned?
22  A    Yes.  Lighter skinned than the

Page 22

1  He had bugs.
2  Q    He had bugs?
3  A    Bugs.
4  Q    Okay.
5  A    I asked her at that time if we
6  could step in the room, and I motioned for her
7  and she stated to me that she didn't want me
8  to point at her.
9  Q    Okay.
10  A    At that time, Mr. Hinton came back
11  down the hall and started talking.  I don't
12  recall anything he said.
13  Q    Okay.  Let me stop you right
14  there.  You said Mr. Hinton came back down the
15  hall?
16  A    Down the hall.
17  Q    So, at one point in time was
18  Mr. Hinton down the hall?
19  A    He was seeing his patients.  There
20  was another one of his patients in one of the
21  rooms down that way, but I don't remember
22  which room it was.

Page 24

1  other officer.  Yes.
2  Q    Okay.  So, the person that you
3  spoke with in 529 was?
4  A    In 527 was the shorter officer.
5  Q    Okay.  What did you say to her?
6  A    Well, I asked first that they
7  couldn't be carrying on a conversation across
8  the hall, and she became loud.  I said they
9  needed to be in the room.
10      MR. FIREISON:  Excuse me.  We're
11  talking about the officer in 527?
12      THE WITNESS:  Seven.  Yes, the
13  officer --
14      MR. FIREISON:  Okay.
15      THE WITNESS:  I was standing with
16  her --
17      MR. FIREISON:  That's fine.
18      THE WITNESS:  -- and I couldn't --
19      BY MR. WILLIAMS:
20  Q    You said she became loud.  What
21  did she say while she was becoming loud?
22  A    That she wasn't going in the room.

Page 23

1  Q    Okay.  He returned, I guess, back
2  up the hall?
3  A    Right.  To get something, and then
4  he was coming back down to go into another
5  patient's room.
6  Q    Okay.  So, when you began talking
7  to the officers, it was just you talking to
8  them at first?  Is that correct?
9  A    Correct, to the officer, yes.
10  Q    After the officers became -- it's
11  your testimony that the officers became loud?
12  A    Yes.  That particular officer.
13  Q    The one in 527?
14  A    Correct.
15  Q    Okay.  It's your testimony that
16  she said, "Don't point at me?"
17  A    Correct.
18  Q    That's the time that Mr. Hinton
19  came back down the hall?
20  A    He appeared back in the vicinity
21  where I was with the officer, yes.
22  Q    Okay.  You said that he said

Page 25

7  (Pages 22 to 25)

06e2e74b-235b-4972-b35c-c8dfab1829a9

1  something?
2      A    Yes.
3      Q    But you don't remember what he
4  said?
5      A    I do not recall what he said.
6      Q    Even though you don't remember the
7  content of what he said, how did he say it?
8      A    He was not loud.  He was not
9  threatening.  He was just verbalizing and I
10  don't know -- like I said, I don't recall
11  exactly what the words were, but --
12      Q    Okay.  I understand that you don't
13  remember the exact words.
14      A    Right.
15      Q    What was the jest of what he was
16  saying to the officer?
17      A    I'm not sure if it had to do with
18  the earlier incident that had occurred.  I'm
19  not really sure.  I don't -- like I said, I
20  don't recall the exact -- I know voices became
21  escalated, patients were now standing out
22  there looking at what was going on.  Other

Page 26

1  staff members came down.
2      Q    Okay.  You referred to an incident
3  that happened before you came on the scene --
4      A    Correct.
5      Q    What, if any, knowledge at that
6  time did you know about that previous
7  incident?
8      A    All I was told is that officers
9  were eating in the hallway.
10      Q    Okay.  Who told you that?
11      A    That was Ms. Alsobrooks and
12  Mr. Hinton also.  Both told me that.
13      Q    So, just to back up, you received
14  a call from Ms. Alsobrooks --
15      A    Correct.
16      Q    -- to come upstairs?
17      A    Correct.
18      Q    During that phone conversation,
19  what, if anything, did she say to you?
20      A    Well, at that time, she said that
21  the officers wanted to see me.
22      Q    Okay.

Page 27

1      A    Which is why I came up.
2      Q    Anything else?
3      A    Just that the incident had
4  occurred that they were eating in the hallway
5  and that Donald had asked them to move inside
6  and that they did not and that Ms. Alsobrooks
7  had gone down and she said she had asked them
8  and they did move inside or move tables
9  inside.
10      Q    Did she say anything about the
11  demeanor of the officers in that telephone --
12  in that phone conversation?
13      A    Not that I can recall.
14      Q    Do you remember how she was
15  speaking to you?  I'm asking you to
16  characterize her voice.
17      A    Just normally.
18      Q    Just normally?  Did Mr. Hinton
19  ever -- was he on the phone also?
20      A    No.  I spoke to him when I arrived
21  on the unit.
22      Q    Okay.  So, you received the call,

Page 28

1  correct?
2      A    Correct.
3      Q    You went upstairs, correct?
4      A    Correct.
5      Q    You got off the elevator, and you
6  went to the nurse's station?
7      A    Correct.
8      Q    Who did you speak with there?
9      A    I spoke with Ms. Alsobrooks and
10  with Mr. Hinton.
11      Q    What did Ms. Alsobrooks say to you
12  in that encounter?
13      A    The same thing she told me on the
14  phone, what had occurred earlier.
15      Q    Again, in a normal voice?
16      A    Yes.
17      Q    Okay.  What, if anything, did
18  Mr. Hinton say to you?
19      A    He told me his side of what
20  happened earlier also.
21      Q    Okay.  What did he say?
22      A    He told me that they were in the

Page 29

8 (Pages 26 to 29)

06e2e74b-235b-4972-b35c-c8dfab1829a9

1    Q    Just for the record to be clearer,
2  the police officer that first put her hands on
3  Mr. Hinton was which officer?
4    A    The short officer.
5    Q    527?
6    A    Correct.
7    Q    During this time, what if
8  anything, was the officer in 529 doing or
9  saying?
10    A    She was standing in front of 529
11  for all I can recall. I don't remember her
12  getting -- even coming over at any time.
13    Q    Was she saying anything?
14    A    Not that I can recall.
15    Q    You used the word thrown against
16  the wall when you referred to Mr. -- the way
17  the short officer handled Mr. Hinton. Can you
18  explain exactly what you saw that made you use
19  the words thrown against the wall?
20    A    She grabbed him and physically put
21  him against the wall so that he made a thud.
22    Q    Okay. So, she put him against the

Page 38

1  wall?
2    A    Right.
3    Q    I guess what I'm trying to do is
4  get you to characterize the way that she put
5  him against the wall. Was it -- did she slam
6  him against the wall or did she just place him
7  against the wall? I'm not trying to give you
8  words. I'm trying to find out what you
9  witnessed.
10    A    She more or less threw him against
11  the wall.
12    Q    Okay. Was it a violent throw, in
13  your opinion, what you saw?
14    A    Yes.
15    Q    Was it a throw that in your
16  experience would've led to injury, any type of
17  injury, bruises, anything?
18        MR. FIREISON: I just have to
19  object because you're asking for speculation
20  here.
21        THE WITNESS: I don't know. I
22  mean, he hit the wall; it made a thud.

Page 39

1        BY MR. WILLIAMS:
2    Q    Okay. A loud thud or just a thud?
3    A    A loud thud.
4    Q    What happened then?
5    A    They had him handcuffed. Well,
6  other police officers arrived on the unit
7  because she had called for assist. They
8  placed him in a room. I could not talk to
9  him. That was all I had. The only other
10  interaction I had with any of them other than
11  when their superior officers came and I gave
12  a statement.
13    Q    Okay. I'm going to ask you to
14  back up just one second.
15    A    Okay.
16    Q    So, they have Mr. Hinton against
17  the wall?
18    A    Correct.
19    Q    When I say they, I mean the short
20  officer in 527.
21    A    Right.
22    Q    Do you know that officer's name?

Page 40

1    A    No, I do not.
2    Q    Do you know the officer's name
3  that was in 529?
4    A    No, I do not.
5    Q    Okay. Did you see any of the
6  officers put handcuffs on Mr. Hinton?
7    A    Yes, I did, and I tried to prevent
8  them from putting the handcuffs on by telling
9  them to please wait till security came up.
10    Q    Which officer put handcuffs on
11  Mr. Hinton?
12    A    The short one.
13    Q    Okay. How did she put handcuffs
14  on him? Do you remember?
15    A    No. I mean, I just remember she
16  pulled his hands back and put the handcuffs on
17  him.
18    Q    She pulled his hands --
19    A    To the back. I can't even -- I
20  don't even -- no, I don't even recall whether
21  it was front or back, but I remember her
22  handcuffing him.

Page 41

11  (Pages 38 to 41)

06e2e74b-235b-4972-b35c-c8dfab1829a9

| | | | | |
|---|---|---|---|---|
| 1 | Q    Okay.  Did you see any officer | | 1 | Q    Okay.  So, how many patients were |
| 2 | push their knee into his back? | | 2 | gathered in the hall? |
| 3 | A    No. | | 3 | A    I saw two. |
| 4 | Q    Okay.  Did he struggle? | | 4 | Q    You saw two?  So, two patients |
| 5 | A    A little. | | 5 | came out a room? |
| 6 | Q    A little?  How was he struggling? | | 6 | A    Correct.  From the other side of |
| 7 | A    He was trying -- kept asking why | | 7 | the hall. |
| 8 | they were arresting him, why they were | | 8 | Q    Okay, and were just looking down |
| 9 | handcuffing him. | | 9 | the hallway? |
| 10 | Q    Did he try to move away from the | | 10 | A    Correct. |
| 11 | officers? | | 11 | Q    What about any other staff or |
| 12 | A    He tried to turn around.  He was | | 12 | employees in that area? |
| 13 | forward and he tried to turn around. | | 13 | A    Other than Ms. Alsobrooks and |
| 14 | Q    Okay.  But the officers kept hold | | 14 | Mr. Goins, I don't recall any others. |
| 15 | of him? | | 15 | Q    Okay.  So, there was -- so, it's |
| 16 | A    Yes. | | 16 | your testimony that there was only two people |
| 17 | Q    Which officer kept hold of him? | | 17 | who were -- who came into the hall to look or |
| 18 | A    The short one. | | 18 | -- |
| 19 | Q    Did the other officer in 529 do | | 19 | A    That's all I recall seeing. |
| 20 | anything? | | 20 | Q    Okay.  Give me one second.  I |
| 21 | A    I don't recall her being involved | | 21 | believe you testified that you told the short |
| 22 | at all.  I don't remember her being next to us | | 22 | officer in 527 to go back into -- that she had |

| | | | | |
|---|---|---|---|---|
| 1 | at all.  I was right next to Donald. | | 1 | to go back into the room? |
| 2 | Q    Okay.  You were next to Donald. | | 2 | A    Right.  I told them that they both |
| 3 | Okay, so now we're going to go back -- we're | | 3 | needed to be in the room with the prisoner. |
| 4 | going to fast forward back.  They placed | | 4 | Q    Why did you say that? |
| 5 | Mr. Hinton -- your testimony is that they | | 5 | A    Because that's what we were doing. |
| 6 | placed Mr. Hinton in a separate room? | | 6 | We have no written policy for it, but that's |
| 7 | A    Correct. | | 7 | what we like, to have the officers in the |
| 8 | Q    Correct?  They would not let you | | 8 | rooms rather than sitting in the hallway. |
| 9 | talk to him? | | 9 | Q    So, there's no written policy |
| 10 | A    Correct. | | 10 | about it? |
| 11 | Q    Okay.  What happened next? | | 11 | A    No. |
| 12 | A    I had to go rearrange the schedule | | 12 | Q    Does this apply to just officers? |
| 13 | for the staff because now we have a nurse | | 13 | A    Right.  Officers, Department of |
| 14 | who's no longer taking care of patients, so I | | 14 | Corrections. |
| 15 | had to reassign.  I assisted the charge nurse | | 15 | Q    That's okay.  What's the basis -- |
| 16 | in reassigning the patients. | | 16 | why do you like them to do that? |
| 17 | Q    Okay.  At the time that there was | | 17 | A    Because a lot of times the |
| 18 | an escalation of yelling between the officer | | 18 | visitors feel uncomfortable when they see the |
| 19 | and Mr. Hinton that you testified to before, | | 19 | officers in the hallway. |
| 20 | you said -- I believe your testimony was that | | 20 | Q    Okay.  Who made the decision that |
| 21 | patients were in the hall. | | 21 | that's going to be the informal -- I'm using |
| 22 | A    Yes. | | 22 | the word informal policy.  You didn't say |

12  (Pages 42 to 45)

06e2e74b-235b-4972-b35c-c8dfab1829a9

SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION

```
———————————————
DONALD RAY HINTON,    )
                      )
            Plaintiff, ) Case No.
                      ) 1:07-cv-00807
v.                    )
                      )
DISTRICT OF COLUMBIA, )
and                   )
                      )
MARCIA L. SLAUGHTER,  )
and                   )
SHAWNEE NOWLIN,       )
                      )
                      )
            Defendants.)
———————————————        )
```

Washington, D.C.
Thursday, November 15, 2007

DEPOSITION OF:

DONALD RAY HINTON

called for examination by counsel for the

Plaintiff, pursuant to Notice of Deposition,

at the Office of the Attorney General, 441 4th

St., N.W., Washington, D.C. at 2:00 p.m., when

were present on behalf of the respective

parties:

420e1941-d1bb-4bc0-9962-00ad0dd0d3c8

| | |
|---|---|
| 1 | A    Yes. |
| 2 | Q    -- Ms. Alsobrooks? |
| 3 | A    Yes. |
| 4 | Q    Okay.  Did you hear what she said |
| 5 | when she was calling for security?  I mean in |
| 6 | other words, did she just call and just ask |
| 7 | for security or did she explain why she needed |
| 8 | security? |
| 9 | A    I recall her saying she could see |
| 10 | this escalating. |
| 11 | Q    Okay.  And after security was |
| 12 | called, Ms. O'Connell was there?  I guess Ms. |
| 13 | O'Connell had arrived? |
| 14 | A    I don't recall. |
| 15 | Q    Okay.  Do you recall how long it |
| 16 | was from the point when security was called to |
| 17 | the point when you followed Ms. O'Connell back |
| 18 | down the hall -- recall how much time that |
| 19 | was? |
| 20 | A    No, I don't. |
| 21 | Q    Okay.  So let's go, you know, |
| 22 | forward again.  Forgive me if it seems like |

Page 62

| | |
|---|---|
| 1 | I'm jumping around.  I just -- you know, my |
| 2 | job is to get as many details as I can, you |
| 3 | know, about the incident.  You did testify |
| 4 | that one of the officers had grabbed your arm? |
| 5 | A    Yes. |
| 6 | Q    Okay.  Well, let me back up again. |
| 7 | You had described to me the things that you |
| 8 | had said to the officers before you went in |
| 9 | and did the assessment and after the |
| 10 | assessment.  When you went back down the hall |
| 11 | with Ms. O'Connell, did you say anything else |
| 12 | to the officers at any time before that |
| 13 | officer grabbed your arm? |
| 14 | A    It was escalating.  I may have.  I |
| 15 | don't recall. |
| 16 | Q    You can't recall if you said |
| 17 | anything or not? |
| 18 | A    I knew it was escalating.  I told |
| 19 | Ms. O'Connell -- I don't recall the full |
| 20 | statement. |
| 21 | Q    Is that when you had taken Ms. |
| 22 | O'Connell's arm and told her this is getting |

Page 63

| | |
|---|---|
| 1 | out of hand and we should go back up? |
| 2 | A    Yes. |
| 3 | Q    Okay.  Was it shortly after you |
| 4 | did that that this officer grabbed your arm? |
| 5 | A    Yes. |
| 6 | Q    Okay.  When the officer -- when |
| 7 | that officer grabbed your arm, what did you |
| 8 | do? |
| 9 | A    Asked her why was she arresting |
| 10 | me. |
| 11 | Q    Okay.  When she grabbed your arm, |
| 12 | did she say that you were under arrest? |
| 13 | A    Yes. |
| 14 | Q    Okay.  So she grabbed your arm and |
| 15 | at the same time said, okay, you're under |
| 16 | arrest? |
| 17 | A    Yes. |
| 18 | Q    Did she say anything else aside |
| 19 | from those words? |
| 20 | A    I recall her saying something, not |
| 21 | exact words. |
| 22 | Q    Okay.  So when she said that and |

Page 64

| | |
|---|---|
| 1 | grabbed your arm, you then asked her why are |
| 2 | you arresting me? |
| 3 | A    Yes. |
| 4 | Q    Okay.  And what did she say? |
| 5 | A    Ms. O'Connell was trying to pull |
| 6 | her arm from me and said also, why are you |
| 7 | arresting him.  You have no right, you have no |
| 8 | right.  By that time, other nurses and |
| 9 | patients were in the hall.  Because of the |
| 10 | commotion, they were yelling that also.  I |
| 11 | think Mr. -- a man voice -- I don't know if it |
| 12 | was Gomes said you have no right, why -- what |
| 13 | are you doing. |
| 14 | Q    Okay.  You said something like Mr. |
| 15 | Gomes or you said you heard a man's voice |
| 16 | saying that, you have no right -- |
| 17 | A    I heard him say what are you |
| 18 | doing, you have no right. |
| 19 | Q    Okay. |
| 20 | A    The person who said that, was this |
| 21 | another nurse? |
| 22 | Q    I couldn't see the face.  My face |

Page 65

17  (Pages 62 to 65)

420e1941-d1bb-4bc0-9962-00ad0dd0d3c8

1    -- I was facing the wall.

2        A    Okay.  It was just a voice tht you
3    heard?

4        Q    Yes.

5        A    Okay.

6        Q    And what did the officer say in
7    response to that, if anything?

8        A    She was saying -- I don't recall
9    exactly what she was saying, exact words she
10   was saying.

11       Q    Okay.  Did she tell you what she
12   was arresting you for?

13       A    I don't recall.

14       Q    So she was still holding on to
15   your arm and you said that you were turned
16   around, that you were facing the wall now?

17       A    I was facing the wall and at that
18   point, I had turned, tried to turn, and she
19   kicked my legs apart.

20       Q    Okay.  So she's holding your arm
21   when you were against the wall, and you tried
22   to turn and she kicked -- she kicked your legs

Page 66

1    apart?

2        A    Yes.

3        Q    Okay.  After she kicked your legs
4    apart, were you still standing up, or did that
5    cause you to fall down?

6        A    I was still standing.

7        Q    Okay.  What happened after she
8    kicked your legs apart?

9        A    She cuffed me.  She had her elbow
10   or something in the lower part of my back.

11       Q    Okay.  Were you in pain at any
12   time when this was happening?

13       A    Yes.

14       Q    Okay.  Can you describe the pain
15   that you were failing?

16       A    The point in my back and the cuffs
17   were on too tight.

18       Q    Okay.  So when she had -- was it -
19   - you said it was her elbow that was in your
20   back?

21       A    I couldn't see what it was but
22   something sharp point in my back.

Page 67

1        Q    So something was in your back.

2        A    Yes.

3        Q    Okay.  And you felt pain from that
4    pressure?

5        A    Yes.

6        Q    You said the other pain you felt
7    was once the handcuffs were on, they were
8    tight?

9        A    Yes.

10       Q    Okay.  Is there any other pain
11   that you felt aside from what you've just
12   described to me?

13       A    Not at that point, no.

14       Q    Okay.  Once the handcuffs were
15   placed on you, what happened nex?

16       A    Officers came from out of nowhere.

17       Q    Can you recall how many officers
18   arrived?

19       A    No, it was like man with a gun and
20   officers within minutes.  I can't -- I on't
21   recall exactly how many, so how long it was,
22   came out of nowhere.

Page 68

1        Q    Okay.  When all those officers
2    arrived, was anybody saying anything to you or
3    anyone talking to you?

4        A    There was lot of commotion, a lot
5    of voices coming from everywhere.  Who was
6    saying what, I don't recall.

7        Q    Was -- do you recall if Ms.
8    O'Connell was still there at the scene?

9        A    Yes. she was.

10       Q    Okay.  Was she -- can you recall
11   what she was saying?  Was she saying anything
12   to you?

13       A    Say again, people were saying
14   everything but I was facing the wall.  I don't
15   recall who was saying what.

16       Q    Okay.  At some point -- well, you
17   said that you were facing the wall and you had
18   your hands cuffed.  At some point, did they
19   turn you around and take you anyplace?

20       A    Yes.

21       Q    Okay.  How long were you standing
22   against the wall with your hands cuffed before

Page 69

18  (Pages 66 to 69)

420e1941-d1bb-4bc0-9962-00ad0dd0d3c8

1    Q    Okay. She pulled you back on the
2    cuffs?
3    A    Yes.
4    Q    The lighter complexion?
5    A    The lighter complected of the two.
6    Q    Okay. Is she -- is -- strike
7    that. Is the lighter complexion officer the
8    one who brought you to the paddy wagon? In
9    other words, did she --
10   A    No.
11   Q    -- lead you?
12   A    No, no.
13   Q    Okay. It was the darker
14   complexion?
15   A    Yes.
16   Q    Okay. Turning to page 11 and
17   looking at counts 10, 11 and 12. These are
18   counts of malicious prosecution. Is it your
19   testimony today that Officers Nowlin and
20   Slaughter, that they acted with malice and
21   without probable cause?
22   A    Yes.

Page 110

1    he has suffered and will continue to suffer
2    severe emotional distress and has incurred and
3    may continue to incur significant medical
4    bills. Have you suffered severe emotional
5    distress after this incident took place?
6    A    Yes.
7    Q    Okay. Could you describe that
8    distress?
9    A    I'm not sleeping. I don't go to
10   sleep at night approximately -- probably 3,
11   4:00 o'clock in the morning and I'm up at 6
12   a.m. to go to work and be there by 6:30. I
13   did start back sleeping until I knew I had, I
14   think on the 7th or probably around the 6th,
15   7th or 8th, knowing I had to come back and
16   deal with this again.
17   Q    Okay. When you say come back and
18   deal with this again, you mean coming in here
19   for your deposition?
20   A    Yes, for the deposition and just
21   the whole ordeal being brought forth to my
22   attention again.

Page 112

1    Q    Okay. Again, that there was no
2    reason for you to be arrested at all?
3    A    No.
4    Q    Okay. On page 13, you have a
5    string of counts that deal with -- a count of
6    intentional infliction of emotional distress.
7    It's counts 13, 14, 15. I wanted to ask you
8    specifically about allegations that are
9    contained in paragraph 99 and it's repeated in
10   paragraph 105 and again in paragraph 110, just
11   for each of the defendants. In the paragraph,
12   it says that you experienced severe emotional
13   distress. The next sentence says, he
14   experienced chest pain and was admitted to the
15   emergency room, and then transferred to the
16   critical care unit of the hospital.
17        Is it your testimony that the chest pain
18   that you felt, did you think it was -- did
19   that result from the distress that you were
20   feeling upon being arrested?
21   A    Yes.
22   Q    Okay. The next sentence says that

Page 111

1    Q    Okay. You said after this
2    incident that you had problems sleeping.
3    Before this incident happened, how many hours
4    of sleep a night would you say you typically
5    received that was normal for you?
6    A    Seven to eight hours of sleep.
7    Q    After this incident happened, how
8    many of hours of sleep did you receive?
9    A    Prior to coming back here, I
10   received all seven to eight hours, but knowing
11   to come back here, I would then just the
12   thought of being closed up, I don't sleep.
13   Q    Right after the incident happened,
14   were you -- you were experiencing difficulty
15   sleepy?
16   A    Yes.
17   Q    Okay. For how long after the
18   incident happened did you experience those
19   difficulties?
20   A    I did not.
21   Q    Okay. You --
22   A    After the incident happened and

Page 113

29  (Pages 110 to 113)

420e1941-d1bb-4bc0-9962-00ad0dd0d3c8

1    then after the things went over, I recall
2    where I had problems sleeping, but going down
3    the line as -- farther it got away from, as
4    far as time passed, I came back to my pattern.
5        Q    Okay. As time passed, you went
6    back to the normal sleep cycle that you were
7    used to before the incident?
8        A    Except when thinking of being
9    closed up, I would stay up and just seeing
10    that they were cuffed, just the whole ordeal.
11        Q    When you say closed up, you mean
12    locked up?
13        A    Locked up, in jail, I guess.
14        Q    Did you ever see any kind of
15    professional help just to talk about what had
16    happened and how you were feeling after that?
17        A    My coworkers.
18        Q    Okay. You talked to your
19    coworkers about it?
20        A    Yes.
21        Q    These are your fellow nurses.
22        A    Yes.

Page 114

1        Q    Okay. Which nurses did you talk
2    to about the incident?
3        A    Basically, every nurse or probably
4    the nurses that was there and was aware of the
5    situation.
6        Q    Okay. Did you ever speak with a
7    psychologist or a counselor or a psychiatrist
8    or social worker or anybody in that big field?
9        A    No, because it carries a stigma.
10    No, I did not.
11        Q    Okay. In speaking with your
12    coworkers about it, did that help you?
13        A    Yes, it did.
14        Q    Okay. Some of your coworkers and
15    your friends you would say?
16        A    Yes. In a way, yes.
17        Q    Okay. Did you speak with -- you
18    spoke with them about the incident after you
19    returned to work, after the incident happened?
20    Is that right?
21        A    They approached me. I just wanted
22    it to pass.

Page 115

1        Q    Okay. When they approached you,
2    did you talk to them about it at that time, or
3    did you -- what I'm getting at is did you talk
4    about it with them over a period of several
5    days or several weeks? Was it a conversation
6    that you had with them right when you got back
7    to work and --
8        A    I don't recall. It was over --
9    some wanted to know what happened and why I
10    was in -- why I was in prison, why -- it was
11    just all in a, I would say, period. I don't
12    know exactly what time period.
13        Q    Okay. At the end of that
14    paragraph that I pointed out about emotional
15    distress, it says that you have incurred and
16    may continue to incur significant medical
17    bills. Can you tell me about what bills
18    you've incurred as a result of this incident?
19        A    Well, not being able to sleep, I
20    take PM -- what is it -- Tylenol PM.
21        Q    Okay.
22        A    And also I'm taking a medication

Page 116

1    called Pep -- because me going to work, during
2    the day, I'm sleepy and I'm not able to stay
3    awake.
4        Q    Okay. Is it fair to say that the
5    sleeping problems is the biggest physical
6    problem you've had as a result of this
7    incident?
8        A    No.
9        Q    Okay. Are there other physical
10    problems you've had as a result of this
11    incident?
12        MR. FIREISON: Excuse me. Another
13    one he's testified to or?
14    BY MR. BRUCKHEIM:
15        Q    Other than what you've testified
16    to?
17        A    Not other than I've testified to.
18        Q    And you testified already that you
19    continue to get treatment for your heart
20    condition?
21        A    It's an ongoing process, yes.
22        Q    That's an ongoing process. Did

Page 117

30  (Pages 114 to 117)

420e1941-d1bb-4bc0-9962-00ad0dd0d3c8

| | |
|---|---|
| 1  you ever have to receive treatment for your | 1  receive, again, in treatment for -- |
| 2  back? | 2      A    CHF. |
| 3      A    Pain there but it's not like it's | 3      Q    Okay.  You had testified that you |
| 4  broken or anything, no. | 4  had your teeth fixed after the incident.  I |
| 5      Q    Okay.  Did you ever have to go see | 5  assume you went to a dentist for that? |
| 6  a therapist or receive any kind of treatment | 6      A    Yes. |
| 7  for your back? | 7      Q    Then did you incur expenses as a |
| 8      A    Again, it carries a stigma. | 8  result of that? |
| 9      Q    Okay.  So in terms of treatment by | 9      A    Yes, I did. |
| 10  a medical professional, I'm guessing, as a | 10      MR. BEATRICE:  Okay.  Why don't we |
| 11  result of this incident, is it fair to say | 11  go off the record and take maybe like a 10 |
| 12  that the only treatment from a medical | 12  minute break.  I think I am pretty much done. |
| 13  professional you received after this incident | 13  I may have a few more questions, but why don't |
| 14  would be the treatment of your heart condition | 14  we take a break. |
| 15  and going to the dentist for your teeth? | 15      (Whereupon, off the record at 4:08 |
| 16      MR. FIREISON:  Excuse me.  Just so | 16  p.m. and back on the record at 4:20 p.m.) |
| 17  -- when you treatment for his heart condition, | 17  BY MR. BRUCKHEIM: |
| 18  you mean at the hospital when he was taken to | 18      Q    Mr. Hinton, I just have a couple |
| 19  the emergency room and then intensive care? | 19  follow-up questions to ask you based on your |
| 20      MR. BEATRICE:  I mean just -- | 20  testimony, and then we should be good to go. |
| 21      MR. FIREISON:  Is that what you're | 21  You had testified -- I believe you testified |
| 22  referring? | 22  that you arrived on duty at about 6:30.  Is |
| Page 118 | Page 120 |

| | |
|---|---|
| 1      MR. BEATRICE:  I mean this would | 1  that right? |
| 2  be ongoing treatment that he receives.  And | 2      A    I arrived on the unit at 6:30, |
| 3  again, it's based on just, you know, what he | 3  yes. |
| 4  told me, but I mean the ongoing treatment he | 4      Q    Six-thirty.  Okay.  Did you walk |
| 5  receives -- | 5  by Room 529 shortly after you arrived? |
| 6      MR. FIREISON:  I understand it's | 6      A    No. |
| 7  just from -- | 7      Q    Okay.  Can you recall around what |
| 8      MR. BEATRICE:  -- for his heart | 8  time you did walk by Room 529 the very first |
| 9  condition. | 9  time? |
| 10      THE WITNESS:  Well, my Coreg does | 10      A    It was when I was doing my |
| 11  has been increased. | 11  assessment, possibly between 7 and 8 I would |
| 12  BY MR. BRUCKHEIM: | 12  guess. |
| 13      Q    Your -- what's this? | 13      Q    Okay.  And when you went to do |
| 14      A    Coreg. | 14  that, that's when you saw Officers Nowlin and |
| 15      Q    What's Coreg? | 15  Slaughter? |
| 16      A    It's a medication that causes the | 16      A    Yes. |
| 17  ventricles not to act as -- you have this | 17      Q    Okay.  did you ever see any other |
| 18  thing called injection flash, and it causes | 18  guards assigned to that room -- |
| 19  the injection flash to be more stronger as | 19      A    No. |
| 20  opposed to being -- the contracility of the | 20      Q    -- before Nowlin and Slaughter? |
| 21  heart is stronger. | 21      A    No, I did not. |
| 22      Q    Okay.  And that's something you | 22      Q    Okay.  You had testified about how |
| Page 119 | Page 121 |

31  (Pages 118 to 121)

420e1941-d1bb-4bc0-9962-00ad0dd0d3c8

00001
1   UNITED STATES DISTRICT COURT
2
3   FOR THE DISTRICT OF COLUMBIA
4
5   DONALD RAY HINTON,    )
6
7   Plaintiff,    )
8
9   V.              ) CASE NO. 1:07-cv-00807
10
11  DISTRICT OF COLUMBIA,  )
12
13  ET AL            )
14
15   Defendant.      )
16
17
18            Bethesda, Maryland
19            Tuesday, February 12, 2008
20
21  DEPOSITION OF:
22            MARCIA L. SLAUGHTER,

00012

1      A. I believe it was in the spring.

2      Q. And what type of training did you

3   receive?

4      A. As I stated, both tactical and

5   practical training, where they bring us current

6   to any things that may have changed within the

7   department.

8      Q. Do you receive any course materials

9   at the time, or is it just you attending class

10  and taking notes?

11     A. Both.

12     Q. Now, have you received any training

13  at all in dealing with health care facilities,

14  such as going to a health care facility,

15  guarding of prisoners, anything relating to

16  health care facilities?

17     A. That's standard in our general

18  orders, so it's nothing that we, per se, go

19  over.

20     Q. So you have never received any

21  training at all; is that correct?

22     A. Correct.

00015
1    the police academy?
2        A. Yes, sir.
3        Q. And what about any training at all in
4    guarding of prisoners, have you received any
5    specific training relating to that area?
6        A. No.  Those are all -- we're all
7    guided by our general orders with that.
8        Q. But you have received no classroom
9    training or in-service training for that; did
10   you?
11       A. No.  When we're on roll call, they
12   will go over that particular general order,
13   along with a series of others.
14       Q. When is the last time that you recall
15   in roll call that they went over -- they,
16   meaning a supervisor, I assume you're talking
17   about?
18       A. Yes.
19       Q. Went over a general order involving
20   guarding of a prisoner or being at a health care
21   facility as a police officer?
22       A. Specific dates, I can't recall.

00018
1      A. Repeat your question.
2    MR. FIREISON:  Repeat it back,
3    please.
4    (Pending question read back by
5       the court reporter.)
6      BY MR. FIREISON:
7      A. No.
8      Q. Have you ever been -- I should say,
9    to the best of your recollection, have you ever
10   been told orally or in writing that when you are
11   assigned to guard a prisoner at a health care
12   facility, such as a hospital, that you are
13   supposed to check in with security, with the
14   administrator, with nurses, or with anybody?
15   MR. WILLIAMS:  Objection to form.
16   Answer the question.
17      BY MR. FIREISON:
18      A. No.
19      Q. Have you ever been the subject of any
20   disciplinary actions at the Metropolitan Police
21   Department?
22      A. Yes.

00028
1  relief, relieving them was for.
2      Q. What was the purpose of you relieving
3  them?
4      A. They were getting off their duty, and
5  we were the assigned officers, next assigned
6  officers.
7      Q. I guess I assumed it, but were you
8  relieving two other officers?
9      A. Yes.
10     Q. Do you know the name of the prisoner?
11     A. I can't recall.
12     Q. Okay.  And when the two officers
13  left, what did you do?
14     A. We were in the hallway guarding the
15  prisoner.
16     Q. Well, the prisoner wasn't in the
17  hallway.  The prisoner was in the room; is that
18  correct?
19     A. That's correct.  We were at his
20  doorway in the hallway, where we had visual
21  contact with him.
22     Q. And were you standing outside the

00029
1   room, were you sitting outside?
2       A. I believe we were sitting.
3       Q. And there were several chairs out
4   there; isn't that correct?
5       A. Yes.
6       Q. And there was a table outside; is
7   that correct?
8       A. Yes.
9       Q. And did you have any contact with the
10  prisoner at all, verbal contact, when you
11  arrived?
12      A. I greeted him and let him know -- I
13  identified myself, and let him know that we were
14  going to be there with him for the duration of
15  the period.
16      Q. And were there any exchange of
17  handcuffs or anything like that?
18      A. Yes.
19      Q. And whose handcuffs -- what happened?
20      A. The officers that were there took
21  their handcuffs.  And one of us, I can't recall
22  which one of us, put our handcuffs on the

00030
1  gentleman.
2      Q. Do you know which one of you?
3      A. No, sir.
4      Q. Were you and/or Officer Nolan eating
5  any food at the time, after the two officers
6  left?
7      A. At some point in time, yes.
8      Q. And what kind of food were you
9  eating?
10     A. I don't recall.
11     Q. Was Officer Nolan eating also?
12     A. Yes.
13     Q. And where were the two of you eating?
14     A. At the table that was in the hallway.
15     Q. The table is right outside the door;
16  is that correct?
17     A. That's correct.
18     Q. And the door -- the room that the
19  prisoner was in had a door on it?
20     A. Yes.
21     Q. Is there any reason you weren't
22  inside the room?

00034

1      A. We both looked at each other and
2   shook our head and said, you know, "What is wrong
3   with this guy?"
4      Q. Did you move the furniture into the
5   room?
6      A. Yes.  We were about to move the
7   furniture in the room.  In the process of that,
8   Mr. Hinton, when we were moving the furniture,
9   he insisted on helping us, by taking the chairs
10   and throwing them in the room.
11    At some point in time, we had another
12   nurse come down the hall to tell us the same
13   thing that he had shouted to us; "Get the damn
14   chairs out of the hallway", that he told us once
15   before, and they were still there.
16    When she said, you know, politely,
17   "Can you please move the chairs in the room",
18   and we told her that that's what we were doing
19   before Mr. Hinton came in and wanted to assist
20   us and started throwing the chairs in the,
21   quote, "damn room", as he said.
22      Q. Did you see him throw any chairs in

00046

1    A. I guess they were just in the general
2  area.
3    Q. Mr. Hinton never hit anybody, is that
4  correct, or came in physical contact with either
5  Officer Nolan or yourself; isn't that correct?
6    A. Yes.
7    Q. And when you arrested him, did you
8  put him up against the wall?
9    A. While we were arresting him, yes.
10    Q. And did you put the handcuffs on him
11  while he was up against the wall or while he is
12  on the floor?
13    A. I can't recall.
14    Q. Was there ever an internal affairs
15  investigation relating to this particular
16  incident or arrest?
17    A. I do not recall.
18    Q. Was there any other type of
19  investigation relating to the incident, the
20  arrest, or any charges that were filed in this
21  case?
22    A. I do not recall.

00047

1      Q. Do you remember ever being contacted
2   by anybody at Metropolitan Police Department,
3   indicating that they wanted to interview you or
4   they were conducting an investigation?
5      A. No, sir, no one has ever contacted
6   me.
7      Q. Do you know the names of the other
8   officers that appeared on the scene?
9      A. I remember one being -- I think he is
10  a sergeant, detective sergeant.
11     Q. Do you know his name?
12     A. Joe-Joe Thomas, if I'm not mistaken.
13     Q. Okay.  What was his role there?
14     A. He asked both myself and Officer
15  Nolan what occurred at the time when we called
16  for backup.
17     Q. What did you say?
18     A. I told him that Mr. Hinton, after
19  being told more than three or four times that we
20  had the situation under control, he was
21  interfering, when he continued to get in Officer
22  Nolan's personal space by pointing his finger in

00052
1   was it on your own or through the academy?
2       A. On my own.
3       Q. Did you ever receive any training to
4   indicate -- and this is regarding fire
5   regulations, that there can't be any furniture
6   in the corridors or anything to block passage in
7   the corridors?
8       A. No.
9       Q. Other than what you have testified
10  to, did you have contact with any other hospital
11  personnel?
12      A. Yes.
13      Q. And who was that, ma'am?
14      A. A gentleman that identified himself
15  as a manager, the manager, admin manager, of the
16  hospital.
17      Q. Do you know his name?
18      A. I don't recall his name.
19      Q. Anybody else you have any contact
20  with?
21      A. No.
22      Q. Do you know what kind of food you had

file:///A|/fireison.txt

00001

1       THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF COLUMBIA

3    ------------------------------:

4    DONALD RAY HINTON            :

5           Plaintiff      :

6    vs.                  : Case No. 1:07-cv-00807

7    THE DISTRICT OF COLUMBIA, et al:

8           Defendant      :

9    ------------------------------:

10                  Bethesda, Maryland

11                  Tuesday, October 30, 20067

12   Deposition of

13         SHAWNEE MONIQUE NOWLIN

14   a witness,  was called for examination

15   by counsel for the Plaintiff, at the Law

16   Offices of FIREISON & ASSOCIATES,

17   4550 Montgomery Avenue, Suite 910, Bethesda,

18   Maryland, 20814, commencing at 11:40 a.m.

19   before Marcia G. Blau, Shorthand Reporter and

20   Notary Public for the State of Maryland, and

21   were present on behalf of the respective

22   parties:

00014

1      A.   No.
2      Q.   Any citations or ribbons for a
3    position?
4      A.   No.
5      Q.   Any acts of valor or anything like
6    that?
7      A.   No.
8      Q.   Have you ever received any training at
9    all in guarding of prisoners in a health care
10   facility?
11     A.   You say "training?"
12     Q.   Training by the Metropolitan Police
13   Department.
14     A.   That is in the D.C. Code.
15     Q.   I didn't ask you that.  I asked you if
16   you received any training at all by the
17   Metropolitan Police Department in guarding of
18   prisoners in a health care facility?
19     A.   Yes.
20     Q.   What type of training?
21     A.   It is information they provided as to
22   how to deal with prisoners at detention

00015
```
 1   facilities and hospitals.
 2      Q.   What type of training did you receive
 3   and when?
 4      A.   It was not hands on training.
 5      Q.   Was it brochures?  Was it a manual.
 6   Was it a memorandum?  Was it a general order?
 7      A.   General order.
 8      Q.   So you were given something that was
 9   handwritten?
10      A.   Yes.
11      Q.   You never received any formal
12   training.  Is that correct?
13      A.   Handwritten, that's it.
14      Q.   Do you have a copy of that here?
15      A.   No.
16      Q.   Is there any reason you didn't bring
17   it?
18      A.   I didn't need it.
19      Q.   Did you see your deposition notice?
20   Do you have a copy of it?
21      A.   No.
22      Q.   Let me show you Exhibit Number 2.
```

00021

```
 1   memorandum?
 2     A.   It is general.
 3     Q.   Do you know the general order number?
 4     A.   No.
 5     Q.   Do you know the date it was issued?
 6     A.   No.
 7     Q.   Other than your receiving the general
 8   order, were you trained in that general order
 9   at all?  In other words, did you have any
10   classroom training?  Did anyone sit down with
11   you individually or in a group to go over what
12   that general order contained?
13     A.   We had classroom training at the
14   academy.
15     Q.   What kind of training did you receive?
16     A.   It was written instruction.
17     Q.   Did you receive any formal type
18   training where an instructor had a training
19   session involving guarding of prisoners in
20   health care facilities, other than the general
21   order you received?
22        MR. WILLIAMS:  Objection, asked and
```

00022
1   answered.  Go ahead.
2       THE WITNESS:  No.
3       BY MR. FIREISON:
4     Q.    Were you ordered to report directly to
5   the hospital on the date in question in May of
6   2006?
7     A.    Yes.
8     Q.    Did you know the day in advance that
9   you were reporting to the hospital?
10    A.    No.
11    Q.    Did you find out at roll call that
12  morning or by radio communication?
13    A.    Roll call.
14    Q.    Was there any other officer also
15  assigned to that detail?
16    A.    My partner, Officer Slaughter.
17    Q.    Did you both ride in the same car or
18  did you ride in separate cars?
19    A.    I can't recall if we were together or
20  if we had separate cars.
21    Q.    Who gave you the detail?  Was it the
22  sergeant or the lieutenant?

00026
1   the chair.  Is that what happened?
2       A.   We have to switch handcuffs.  We
3   placed our handcuffs on the prisoner, and we
4   sat down in the chairs.
5       Q.   Who placed the handcuffs on the
6   prisoner?
7       A.   My partner, Officer Slaughter.
8       Q.   Did you see her do it, or did you just
9   go in and do it?
10      A.   She just went in and did it.
11      Q.   So you didn't see her do it?
12      A.   No.
13      Q.   You don't know if she did it or not;
14  do you?
15      A.   He had handcuffs on.
16      Q.   You said you didn't see it.
17      A.   I didn't see her place them on the
18  prisoner, but he was secure.
19      Q.   How do you know?
20      A.   Because it's my partner.
21      Q.   I'm sorry?
22      A.   It's my partner.  She told me he had

00029
```
 1   and continued on.
 2      Q.   Do you remember her name?
 3      A.   No.
 4      Q.   What was the next contact you had with
 5   any hospital personnel?
 6      A.   Mr. Hinton.
 7      Q.   Prior to Mr. Hinton, were you required
 8   to sign in at all when you came on duty at the
 9   hospital?
10      A.   No.
11      Q.   Were you required to report to any
12   hospital personnel?
13      A.   Repeat that.
14      Q.   Were you required to report to any
15   hospital personnel that you were changing
16   shifts or coming on duty?
17      A.   No.
18      Q.   When you came on duty, you said there
19   was a table with about four chairs out in the
20   corridor.  Is that correct?
21      A.   Yes.
22      Q.   Was there any food on that table at
```

00045

1      Q.   When I say, "subpoena," I mean issued
2   by the U.S. Attorney or the Attorney General's
3   office.  It may have been the Corporation
4   Counsel at that time.
5      A.   I don't recall.
6      Q.   Have you ever been the subject,
7   including this case, of an internal affairs
8   investigation?
9      A.   No.
10     Q.   Did you ever inquire as to the case
11  status of the criminal charges either through
12  the Attorney General's office, Corporation
13  Counsel's Office, or the U.S. Attorney's
14  office?
15     A.   Charges place on whom?
16     Q.   Against Mr. Hinton?
17     A.   No.
18     Q.   Since you were involved in the arrest,
19  you weren't curious as to what happened in the
20  case?
21     A.   No, not really.
22     Q.   Did you have to file a report as a

00047
1   hall to get his supervisor.
2      Q.   Did you do anything at all?
3      A.   Just put the furniture back in the
4   room.
5      Q.   What about the supposed second time?
6      A.   The second time he was arrested.
7      Q.   What happened the second time, what
8   did you do?
9      A.   He was arrested the second time.
10     Q.   Were you irritated at that time?
11     A.   Pretty much.
12     Q.   You were angry also; weren't you?
13     A.   No.  I wasn't angry.
14     Q.   Who told you to put the tables and
15  chairs back in the room, Mr. Hinton, the
16  supervisor, or both?
17     A.   Each stated that on the first
18  encounter we had with him.
19     Q.   But you didn't do it at that time; did
20  you?
21     A.   Yes, we did.
22     Q.   You didn't wait for the supervisor to

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

DONALD RAY HINTON )
)
    Plaintiff )
)
    v. )    Case No.: 1:07-cv-00807
)
THE DISTRICT OF COLUMBIA, *et al.* )
)
    Defendants )
_____)

## PLAINTIFF'S SUPPLEMENTAL REQUESTS FOR ADMISSION

You are hereby requested to admit the Requests set forth below. Please note the following:

A.    Each matter of which an admission is requested shall be deemed admitted unless, within thirty (30) days after service of this request, the Defendant serves a response signed by the Defendant or counsel.

B.    As to each matter of which an admission is requested, the response shall specify an objection, or shall admit or deny the matter, or shall set forth in detail the reason why the Defendant cannot truthfully admit or deny it. The reasons for any objections shall be stated.

C.    A denial shall fairly meet the substance of the requested admission, and when good faith requires that the Defendant qualify an answer or deny only a part of the matter of which an admission is requested, the Defendant shall specify so much of it as is true and deny or qualify the remainder.

D.    The Defendant may not give the lack of information or knowledge as a reason for failure to admit or deny unless the Defendant states that after reasonable inquiry the information known or readily obtainable by the Defendant is insufficient to

enable the Defendant to admit or deny.

E.    The Defendant who considers that a matter of which an admission is requested presents a genuine issue for trial may not, on that ground alone, object to the request but the party may, subject to provisions, deny the matter or set forth reasons for not being able to admit or deny it.

F.    <u>Expenses on Failure to Admit</u>. If you fail to admit the genuineness of any document or the truth of any matter as requested, and if the party requesting the admissions later proves the genuineness of the document or the truth of the matter, the requesting party may move for an order requiring you to pay the reasonable expenses incurred in making the proof, including reasonable attorney's fees.

G.    All documents for which requests are being made herein have been furnished or made available for inspection and copying, and accordingly, they are not attached hereto.

**ADMISSIONS**

1.    Metropolitan Police Department have no documents relating to any FIT unit investigation of the defendant officers involved in this case and no such documents were produced to Plaintiff in response to Plaintiff's Request for Production of Documents.

2.    There was no FIT unit investigation of the defendant officers involved in this case arising out of the incident alleged in the complaint.

3.    PD form 313, an arrestee injury or illness report, does not exist in this case and such document was not produced to Plaintiff in response to Plaintiff's Request for Production of Documents.

2

4. PD form 312, a daily report of prisoners guarded, does not exist in this case and such document was not produced to Plaintiff in response to Plaintiff's Request for Production of Documents.

5. PD form 255, an arrest report, does not exist in this case and such document was not produced to Plaintiff in response to Plaintiff's Request for Production of Documents.

6. PD form 47, an advice of rights form, does not exist in this case and such document was not produced to Plaintiff in response to Plaintiff's Request for Production of Documents.

7. No PD forms 119, statements of witnesses, were produced to Plaintiff in response to Plaintiff's Request for Production of Documents.

8. The most recent General Order regarding the Medical Treatment and Hospitalization for Prisoners, General Order No. 502.07, has an effective date of January 17, 1975.

9. No officers' notes and/or notebooks were produced to Plaintiff in response to Plaintiff's Request for Production of Documents.

10. Officers Nowlin and Slaughter did not check in with Greater Southeast Community Hospital (GSECH) Security desk when relieving the previous officers guarding the prisoner in Room #529 at GSECH.

11. All PD forms that do not exist in this case and not produced to Plaintiff is a result of the non-preparation of such PD forms in this case.

3

12.    Other than the documents Defendants already produced in discovery through today's date, there exist no other documents responsive to Plaintiff's Request for Production of Documents.

**LOUIS FIREISON & ASSOCIATES, P.A.**

By: _Louis Fireison (Ply)_

Louis Fireison, Fed ID #103424

By: _Patricia H. Ley_

Patricia H. Ley, Fed ID # MD17181
4550 Montgomery Avenue
Suite 910N
Bethesda, Maryland 20814
(301) 652-7500

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this _22nd_ day of February, 2008, a copy of the foregoing was mailed, postage prepaid, addressed to:

Michael Bruckheim, Esquire
Assistant Attorney General
Office of the Attorney General
441 4th Street, NW,
6th Floor North
Washington, DC 20001

_Patricia H. Ley_

Patricia H. Ley

# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

DONALD RAY HINTON )
)
  Plaintiff )
)
  v. )  Case No.: 1:07-cv-00807
)
THE DISTRICT OF COLUMBIA, *et al.* )
)
  Defendants )
)

## CERTIFICATE OF DISCOVERY

I HEREBY CERTIFY that on the _22nd_ day of February, 2008, a copy of

Plaintiff's Supplemental Requests for Admission was mailed, postage prepaid, to:

Michael Bruckheim, Esquire, Assistant Attorney General, Office of the Attorney

General, 441 4th Street, NW, 6th Floor North, Washington, DC 20001, with a copy of

this certificate attached. I will retain the original of said documents in my possession,

without alteration, until the case is concluded in this Court, the time for noting an

appeal has expired, and any appeal noted has been decided.

        Respectfully submitted,

        **LOUIS FIREISON & ASSOCIATES, P.A.**

        By: _____
        Louis Fireison, Fed ID #103424

        By: _____
        Patricia H. Ley, Fed ID # MD17181
        4550 Montgomery Avenue
        Suite 910N
        Bethesda, Maryland 20814
        (301) 652-7500

        Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

DONALD RAY HINTON                    )
                                     )
    Plaintiff                    )
                                     )
    v.                           )        Case No.: 1:07-cv-00807
                                     )
THE DISTRICT OF COLUMBIA, *et al.*   )
                                     )
    Defendants                   )
_____)

## DESIGNATION OF EXPERTS

Plaintiff, Donald Ray Hinton, by and through his counsel Louis Fireison &

Associates, P.A. and Louis Fireison, Esq. hereby designates the following as

experts that may be called to testify in this case:

1.    James E. Bradley, PO Box 74, Simpsonsville, Maryland, 21150, 202-

297-0727, may be called as an expert to testify as to Police Officers' and

Police Departments' Conduct and National Standards of Care. The expert is expected

to testify as to the National Standards of Care for Police Departments and its officers.

that the police officers violated the standards of care, that they failed to follow police

procedures, that they failed to follow General Orders, rules and regulations

and issues related to the violation of civil rights. The Curriculum Vitae for Donald Ray

Hinton is attached. A report will be furnished upon receipt.

Respectfully submitted,

**LOUIS FIREISON & ASSOCIATES, P.A.**

By: _____

Louis Fireison
4550 Montgomery Avenue
Suite 910N
Bethesda, Maryland  20814-3344
(301) 652-7500

Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 9th day of January , 2008, a copy of the

foregoing was mailed, postage prepaid, via ordinary mail, addressed to:

Michael Bruckheim, Esquire
Assistant Attorney General
Office of the Attorney General
441 4th Street, NW,
6th Floor North
Washington, DC 20001

_____
Louis Fireison

P.D. 360 Rev. 9/85 METROPOLITAN POLICE DEPARTMENT - Washington, D.C. - REQUEST FOR TELETYPE MESSAGE

| 1. REQUEST FOR | 2. TYPE | 3. COMPLAINT NUMBER | 6. DATE OF REQUEST |
|---|---|---|---|
| ☐ LOCAL LOOKOUT<br>☐ INTERSTATE TT<br>X ADMINISTRATIVE TT<br>☐ DETAIL. (See Reverse) | X ORIGINAL<br>☐ EXPEDITE<br>☐ ADDITIONAL<br>☐ CANCEL<br>☐ CORRECTION<br>☐ REPEAT<br>☐ REPLY | | **May 25, 2007** |
| | | 4. UNIT NUMBER | 7. REQUESTING ELEMENT<br>**OOD** |
| | | 5.<br>X  NOT FOR THE PRESS | 8.<br>☐  FLASH TT REQUESTED |

**9. TO**        **The Force**

## TO BE READ AT ROLL CALLS FOR THE NEXT 2 WEEKS
## HOSPITAL GUARD DETAILS

**Members are reminded of the contents of General Order 502.07 Medical Treatment and Hospitalization for Prisoners.  Though sick or injured prisoners may pose additional hardships on the arresting and transporting officers and district staffing levels, it is necessary to ensure that all members strictly abide by the established rules, regulations, and guidelines to ensure safe and secure transport, treatment, and holding environments.**

**Prisoners who are taken to a medical facility for treatment must be closely monitored at all times.  As outlined in TT-10-078-06 and TT-01-425-02, _two_ officers shall accompany a prisoner during transportation and during treatment at any medical facility.  Opportunities for escape, suicide, and assault on hospital personnel, transporting officers, other patients, and the public will be more prevalent if the prisoner is unrestrained (during actual treatment) and/or out of sight.  It is for this reason that only under the most unusual of circumstances should the prisoner ever be out of the guarding/transporting officer's sight.**

**If the prisoner is admitted to the hospital, the transporting officer shall immediately notify the official then in charge of his/her organizational element and a guard detail shall be instituted by that official.  Watch Commanders shall complete a Hospital Tracking Form (HTF) and comply with the contents of TT-06-094-03.  Further, officials will be held strictly accountable for compliance with General Order 502.07, Part II-B-3, which states:**

> **A sergeant assigned to the district where a prisoner is under guard at a hospital shall visit such location at least once during each tour of duty.  All sergeants making such required visits will personally record the time of their visits on the reverse side of PD Form 312 (Daily Report of Prisoners Guarded).  A midnight sergeant on duty at the district shall then collect the PD 312 from the officer on the guard detail, check it for accuracy, and convey it to his district to be forwarded to Headquarters with the district's morning papers.**

| SENDER-BADGE-ORG. ELM. | AUTHORIZED BY-BADGE-ORG.ELM. | BUREAU HEAD APPROVAL |
|---|---|---|
| Kelly O'Meara, Acting Executive Director<br>Office of Organizational Development | Nola M. Joyce<br>Senior Executive Director<br>Office of Strategic Analysis and Innovation | Cathy L. Lanier<br>Chief of Police |

COMMUNICATIONS DIVISION USE ONLY

| REMARKS | DATE AND TIME |
|---|---|
| | TT#05-097-07 |
| | TELETYPE NUMBER<br>*TT05-097-07* |

P.D. 360 Rev. 9/85 METROPOLITAN POLICE DEPARTMENT - Washington, D.C. - REQUEST FOR TELETYPE MESSAGE

| 1. REQUEST FOR | 2. TYPE | 3. COMPLAINT NUMBER | 6. DATE OF REQUEST **May 25, 2007** |
|---|---|---|---|

1. REQUEST FOR
☐ LOCAL LOOKOUT
☐ INTERSTATE TT
X ADMINISTRATIVE TT
☐ DETAIL (See Reverse)

2. TYPE
X ORIGINAL
☐ EXPEDITE
☐ ADDITIONAL
☐ CANCEL
☐ CORRECTION
☐ REPEAT
☐ REPLY

3. COMPLAINT NUMBER

6. DATE OF REQUEST
**May 25, 2007**

4. UNIT NUMBER

7. REQUESTING ELEMENT
**OOD**

5. X NOT FOR THE PRESS

8. ☐ FLASH TT REQUESTED

9. TO    **The Force**

## TO BE READ AT ROLL CALLS FOR THE NEXT 2 WEEKS
## HOSPITAL GUARD DETAILS

**Officials shall also clearly indicate these activities on their PD 775.**

**Officers assigned to guard the prisoner shall remain at their post at all times and give full time and attention to the guarding of the prisoner and not become lax, careless, or complacent due to long tedious hours of little activity. Therefore, frequent rotation of guards, granting of restroom and meal breaks, and close supervision is necessary. Officers shall also avoid fraternizing with the prisoner at any time and restrict unauthorized contact and access to the prisoner. All visitors and unusual occurrence shall be carefully documented and brought to the attention of an official.**

**This teletype shall remain in effect until incorporated into General Order 502.07.**

**The department is currently in the process of identifying alternative solutions to alleviate PSA members from the responsibility of hospital details.**

SENDER-BADGE-ORG. ELM.
Kelly O'Meara, Acting Executive Director
Office of Organizational Development

AUTHORIZED BY-BADGE-ORG.ELM.
Nola M. Joyce
Senior Executive Director
Office of Strategic Analysis and Innovation

BUREAU HEAD APPROVAL
Cathy L. Lanier
Chief of Police

COMMUNICATIONS DIVISION USE ONLY

REMARKS

DATE AND TIME

FILE TT#05-098-07

TELETYPE NUMBER
TT05-098-07

| Greater Southeast Community Hospital | | Page 1 of 10 |
|---|---|---|
| Title: | Care of Patient under legal or correctional restriction Under Legal or Correctional Restrictions | |
| Policy No: | ADM 03-019 | Effective/Revised Date: 09/2005 |

## POLICY

The policy outlines the responsibilities and defines the procedures for the treatment, admission, control and disposition of patients under legal or correctional restrictions. **Patients under legal or correctional restrictions will be seen in the ED even if the ED has gone on reroute.**

## PROCEDURE

A. Transporting Patients Under Legal or Correctional Restrictions Through the Facility (Greater Southeast Community Hospital)

1. All patients under legal or correctional restrictions requiring treatment care will be transported in full administrative restrains (either four point or four point plus the lock box) and accompanied by at least two armed Correctional Officer.

2. The Doctor's elevator has been dedicated for use to transport all patients under legal or correctional restrictions. When in use, no other persons are permitted on the elevator other than the patient, officer and applicable health care providers. In the event the Doctor's elevator is out of service, one of the three patient elevators will be isolated for correctional use. The correctional patients will access the elevator on the ground floor.

B. Documentation Requirements (ED)

When brought to the Emergency Room for treatment, the following will occur:
- The Correctional Officers and Nursing staff will take the patient to the treatment area. A representative from the Admitting Department will register the patient at bedside.
- If after triage, the patient has to wait to be taken to the treatment area; the patient along with the correctional officer will wait in the Room 167 off the main corridor, which is designated for correctional patient and restroom is provided
- The patient will be attended to and regularly evaluated per policy by the ED nursing staff. While in the waiting area, the correctional officer will escort the patient to the restroom. While in the treatment area, patient should use the urinal and/or bedpan inside Room 167.
- The administrative restraints will be placed/remain placed by the Department of Corrections. Upon request of the Physician/Nurse, the restraints may be removed if they impede assessment/treatment of the patient.

| Greater Southeast Community Hospital | | Page 2 of 10 |
|---|---|---|
| Title: | Care of Patient under legal or correctional restriction Under Legal or Correctional Restrictions | |
| Policy No: | ADM 03-019 | Effective/Revised Date: 09/2005 |

ED nursing staff shall document in the progress note section of the ED Flow Sheet the following:

- Type/location of administrative restraints
- The presence of Officer(s)
- Physical assessment (i.e., neurovascular, movement, etc.)
- Nourishment and elimination break.

C. Hold Room Process

Patients requiring special process are required to be placed in the Hold Room located on 7 Secure Room 720.

Officers are required to remain and monitor the patient at all times.

Lunch will be provided by detaining Facility when applicable.

In an event of an emergency, the nurses are required to contact the emergency room and the officer will transport the patient to the ER.

D. Admission Process

1. The movement of patient under legal/correctional restriction from the ED will be as outlined below. Patients admitted to a secured unit will be transported using the Doctors elevator.

   - Patients admitted to all other units will also use the Doctors elevators. Patients will be entered into computer system as Noinfo, last name, and first name.
   - Medical care of the patient is under the direction of the medical staff.
   - All patient information will be held confidential.
   - All controversies regarding the patient with regard to law enforcement or corrections will be referred to the Security Department.

2. Male and female patients will be admitted to the Secured Unit and staff will assign bed accordingly to maintain patient privacy.

3. Perioperative Services (Operating Room, Post Anesthesia Unit, Ambulatory Surgery and Diagnostic) and Labor and Delivery.
   a. All patients under legal or correctional restrictions requiring treatment/care in any of the areas listed above will be transported via stretcher, restrained administratively (shackles) using two point opposing restraints at all times and accompanied by at least two Correctional Officers.
   b. Security Officer will be notified immediately of any patient under legal or correctional restriction.

| Greater Southeast Community Hospital | | Page 3 of 10 |
|---|---|---|
| Title: | Care of Patient under legal or correctional restriction Under Legal or Correctional Restrictions | |
| Policy No: | ADM 03-019 | Effective/Revised Date: 09/2005 |

c. Physician/Nurse may request removal of administrative restraints. The Correctional Officers must remain with patients and remove restraints as requested. However, while the patient is under general anesthesia the administrative restraints may be removed. The Correctional Officer may wait for the patient outside of the OR. The patient must be restrained while in PACU.

d. There should be nothing left in arm's reach of the patient.

e. Access to the patient and/or patient's room shall be restricted except for GSCH staff caring for the patient and Correctional Officer. Visitation/inquiries by family members are prohibited. All requests shall be referred to the assigned Correctional Officers.

f. **Patients admitted to OB will be transferred back to Secured Unit after delivery as soon as bed is available. There will be no bonding between mother and baby .**

g. All patients must use the bedpan and/or urinal under the surveillance of the Correctional Officers. Patients are not allowed to use the restrooms. The privacy of the patient will be maintained.

h. Discharge instructions will be given verbally to the patient. This does not include the return clinic appointment date and time. Sealed written instructions will be given to the Correctional Officer.

i. All written discharge instructions including prescribed medications will be placed in a sealed controlled jacket envelope, which is transported by the Correctional Officer.

j. No discharge medications or prescriptions will be given to the patient upon leaving the unit.

k. **Discharge Summary must be completed prior to patient's discharge to legal or correctional facility.**

l. The Correctional Officers must adhere to the appropriate dress code as required for each unit.

m. Social Services will be contacted immediately after a correctional patient delivers a baby to address the disposition of the infant.

n. Visitation of baby is prohibited.

| Greater Southeast Community Hospital | | Page 4 of 10 |
|---|---|---|
| Title: | Care of Patient under legal or correctional restriction Under Legal or Correctional Restrictions | |
| Policy No: | ADM 03-019 | Effective/Revised Date: 09/2005 |

E.  Admission of patients Under Legal or Correction Restrictions

1.  Following medical determination of the need for admission, hospital personnel shall carry out the admission procedure.

2.  Patients under the Department of Correction (DOC) and Corrections Corporation of America (CCA) shall be admitted to the Security Unit if an appropriate bed is available. If the bed is not available, the patient will be admitted to another unit.

3.  **Patients will be assigned to a private room when admitted to a unit other than the Secured Unit.**

4.  **In the event that there are two same sex patients under legal or correctional restrictions admitted on the same floor, they will be assigned together to the same room with appropriate office surveillance.**

5.  **Patients assigned to another room must be under constant surveillance and level of security determined by Dept. of Corrections.** Patients shall be in at least one wrist and one ankle administrative restraint.

6.  Access to the patient and/or patient's room shall be restricted to staffing caring for the patient. Visitation/inquiries by family members is prohibited. All requests shall be referred to the assigned Correctional Officer.

7.  Patients assigned a room that is not on the security unit must use the bedpan and/or urinal under the surveillance of the Correctional Officers. Patients are not allowed to use the restroom.

8.  Patients may have an "out of bed" order for medical reasons only, i.e., post op-breathing activity, post partum. This order is limited to the day and evening shifts unless special arrangements are made with the Department of Corrections. A sealed copy of the medical order must be given to the Correctional Officer.

9.  One-to-one nursing is provided to those patients with suicidal ideation. The attending physician or the Clinical Officer will request psychiatric consultation.

10. Mechanical restraints may be ordered if behavior dictates.

11. Patients assigned to outposts are managed in accordance with the same guidelines and/or standards/requirements as on the security unit

F.  Direct Admissions

| Greater Southeast Community Hospital | | Page 5 of 10 |
|---|---|---|
| Title: | Care of Patient under legal or correctional restriction Under Legal or Correctional Restrictions | |
| Policy No: | ADM 03-019 | Effective/Revised Date: 09/2005 |

Correctional patients may be admitted directly from Department of Corrections (DOC), Correction Corporation of America (CCA) or another area hospital without being seen in the ER.

1.  The Patient Flow Coordinator/designate must be notified of pending admission by DOC, CCA or area hospital.

2.  The Patient Flow Coordinator/Administrative Supervisor must notify the Attending Physician of the pending admission and obtain bed placement from Admission Office. In the event the Attending Physician cannot be notified, the **patient must be seen in ER or remain in the present care facility.** Patients requiring intensive care intervention will be transported to the emergency department and stabilized treated and/or admitted.

3.  Patients will be seen in the Emergency Dept. **even if the ED is on re-route.**

4.  Patient(s) may be admitted directly to any unit as indicated by the patient's acuity and needs. Intensivist must approve patients needing critical care.

5.  Admission paper work must accompany patient to the accepting unit and must be delivered to the unit by the Patient Flow Coordinator/designate or admission clerk prior to patient arrival on the unit.

6.  The Patient Flow Coordinator/Designate must give a verbal report to the receiving unit prior to the patient's arrival.

7.  When the patient is being referred from another hospital, the nurse on the accepting unit must receive a report from the nurse transferring the patient prior to patient's arrival.

G. Release of Inmate Patient from Custody

When the patient has completed his/her sentence while hospitalized the correctional officer on duty will present a release order to the charge nurse and will procure the patient's clothing and valuables from the Central Detention Facility or other facility. The patient's physician will write an order transferring the patient to the appropriate medical unit in the hospital immediately.

H. Discharge from the GSCH

1.  When the patient's medical condition is no longer acute and continuing treatment can be provided for at the Department of Corrections (DOC), Corrections Corporation of America (CCA) or in the clinic, the physician or nurse practitioner will write a discharge order by 2:00 p.m.

| Greater Southeast Community Hospital | | Page 6 of 10 |
|---|---|---|
| Title: | Care of Patient under legal or correctional restriction Under Legal or Correctional Restrictions | |
| Policy No: | ADM 03-019 | Effective/Revised Date: 09/2005 |

2. The nurse will notify the Case Manager by calling 202/3989-2868 or 202/574-6049. The Case Manager will notify security personnel and DC DOC representative of the impending discharge. Only mandatory releases will be discharged after hours, during holidays or weekends, the discharge is to be logged in the discharge logbook. If for security reasons there is a need to return an inmate to the DC Jail, then the physician treating the patient at GSCH must be consulted to determine whether the patient cannot be discharged for medical reasons, the Department of Corrections will then take other appropriate security measures.

3. If the physician treating the patient is not available, the following physicians will be contacted in order to secure a decision regarding the appropriateness of discharging the inmate: the Attending Physician, the Department Chairperson or the Chief Medical Director. In the case where the patient refuses treatment and wishes to sign out against medical advice and/or is refusing treatment, the physician will complete and have the patient sign GSCH form #7-005 – Patients Leaving AMA - specifying the treatment or diagnostic procedure the patient is refusing. If the patient refuses to sign, two (2) witnesses should be asked to sign with the physician. The Correctional Officer then escorts the patient back to the Department of Corrections.

4. A report will be called to the charge nurse of the receiving institution by nurse on notes, notification of the receiving institution, as well as pertinent information regarding the inmate's medical conciliation and needs. The RN or **LPN will complete the nursing discharge summary, review the discharge plan and discuss discharge instructions with the inmate and place a copy of the discharge plan/instructions** in the DC DOC medical record for return to the receiving institution.

5. All inmates must be cleared for TB prior to their return to the receiving correctional institution via a negative PPD and/or negative chest x-ray within 30 days.

I. Death of a Patient

After the physician has pronounced the patient, the nurse will notify the Correctional Officer on duty immediately. The remains accompanied by a Correctional Officer will be removed to the Hospital morgue. The remains will be held for fingerprinting, photographs and identification in accordance with Department of Corrections Regulations prior to being released to the D.C. Medical Examiner. The Correctional Officer on duty will notify Department of Corrections authorities.

J. Security Precautions for Staff

| Greater Southeast Community Hospital | | Page 7 of 10 |
|---|---|---|
| Title: | Care of Patient under legal or correctional restriction Under Legal or Correctional Restrictions | |
| Policy No: | ADM 03-019 | Effective/Revised Date: 09/2005 |

1.  Only staff with valid picture identification will be allowed to seek entrance to Patient Care areas. This includes physicians, nurses, food services, housekeeping, maintenance workers, etc. (Exception: If patient is critical/terminal, visitation will be arranged through detaining authority.

2.  Staff may not carry scissors or other sharp instruments on their person.

3.  Staff may not convey messages (verbal and written) between patients or between patients and outside persons. Request for such communications are to be referred to the Corrections Officer.

4.  No medication of any kind should be left at the bedside. Should a physician request that medication such a nitroglycerin or gelusil, etc. be left at the bedside for self-administration by the patient, the nurse should explain that the Department of Corrections prohibits this action.

5.  Patients may self administer medications, (i.e., insulin) only under direct supervision by a nurse.

6.  All medications must be consumed in the presence of the administering nurse. Special care must be taken to confirm that a patient has swallowed all pills given. Oral pain medication with the exception of MS Contin should be crushed to prevent medication hoarding.

7.  Only a current infusing IV container may be kept at the bedside. Any "to follow" containers will be kept in the locked nurse server.

8.  No treatment supplies or solutions may be stored at the bedside unless in constant use (i.e., suction machines and suction kits).

9.  The Chief of the Classification and Parole Unit, Department of Corrections is responsible for the provision of social services to inmate patients from Department of Corrections.

10. All staff must be knowledgeable of the requirements and individual roles in case of fire, disaster and/or medical emergency.

    -   Fire: The Correctional Officer on duty in the Security Unit will supervise the evacuation of patients from the area in which the fire is located.
    -   Disaster: per manual and policy.
    -   Medical Emergency: Team member will be permitted access to the patient unit upon presentation of a valid pictured identification card and sign in. The Correctional Officer will shakedown the area immediately after the Code Blue Team has left the Lock Ward.

| Greater Southeast Community Hospital | | Page 8 of 10 |
|---|---|---|
| Title: | Care of Patient under legal or correctional restriction Under Legal or Correctional Restrictions | |
| Policy No: | ADM 03-019 | Effective/Revised Date: 09/2005 |

11.   Socialization between staff and Correctional Officers is not permitted.

K.  Security Regulations for Patients

1.   Socialization between male and female patients is not permitted.
2.   No personal clothing may be retained, except shoes.
3.   Dentures and eyeglasses may be retained.

L.  Responsibilities of Officers(s)

1.   Attentiveness to the patient and immediate environment is expected at all times.  The officer must be alert, with full view of the patient.  There shall be no sleeping, reading magazine/newspaper, watching television, personal telephone calls.

2.   Officer(s) shall SIT IN CHAIR OUTSIDE THE ENTRANCE WAY OF THE PATIENT'S ROOM.  EXCEPTION – ISOLATION.  Officer(s) are not permitted to sit or lie on the patient's bed.

3.   Any problem must be reported to the Nursing Supervisor immediately who will notify the following:

-   Director of Security/Supervisor on duty.
-   Administrator On-Call (off shifts, weekends, holidays)
-   Chief Nursing Officer
-   Chief Operating Officer

4.   Inmates should not be told when he or she is to be discharged.

5.   Officers reporting for duty to guard an inmate/suspect should check in with Security prior to going on duty.

6.   Offices should contact the Security Department when an inmate/suspect is being moved (i.e. going down for specialized treatment or being transferred to another unit, etc.).

7.   Telephones are not allowed in patient rooms.  Officers will have use of the wall phone in corridor or at the nursing station.

8.   Visitors who are allowed to visit must check in with the Correctional Officer who will give them a pass and advise them to have the proper I.D. length of time to visit (15 minutes) and only one visitor per patient.

9.   The Security Department must be notified in advance when an inmate is to be transported to the facility.

| Greater Southeast Community Hospital | | Page 9 of 10 | |
|---|---|---|---|
| Title: | Care of Patient under legal or correctional restriction Under Legal or Correctional Restrictions | | |
| Policy No: | ADM 03-019 | Effective/Revised Date: 09/2005 | |

10. **When an inmate is brought into the ED, patient will be placed in Rm. #12. When called back for treatment, the patient will be transferred to the designated DOC/MPD patient care (previously Fast Track) area**

11. **If a bed-ridden inmate is transferred, it is the responsibility of the Officer to accompany the inmate, assisting with equipment or bed movement as directed by the medical staff.**

12. **In the event of a patient fall, an officer may assist with patient transfer as directed by Medical Staff.**

M. Diagnostic Exams – In-house

   1. Document Liaison Nurse will be contacted at least 24 hours in advance to arrange transportation. (Call 202/901-0154 for out of Hospital appointments and coordination of correctional officers).

   2. At least two (2) Correctional Officers and a Nurse will accompany the patient to the exam.

   3. The patient will be restrained administratively per policy.

   4. Coordination o the scheduling/the appointment will be communicated to the Correctional Officer/Correctional Liaison.

N. Scheduling of Outpatient Services

   1. All requests for outpatient services shall be made via off site consultative request forms.

   2. The following information must be included on the forms:

      **Inmate Name, DOB, DCDC#, Social Security #, Pertinent Medical History, Service Requested, Referring Physician, Referral Facility, Nature of Request (Routine, Urgent, Emergency).**

   3. Once consultations are completed, they should be faxed to the Case Manager at 202/373/5739. The case Manager should be called or paged for emergency requests.

   4. Routine request will be scheduled within 30 days. Urgent requests will be scheduled within 7 days; emergency requests will be scheduled as soon as possible.

| Greater Southeast Community Hospital | | Page 10 of 10 |
|---|---|---|
| Title: | Care of Patient under legal or correctional restriction Under Legal or Correctional Restrictions | |
| Policy No: | ADM 03-019 | Effective/Revised Date: 09/2005 |

     5.     Notification of scheduled dates for service will be faxed back to the requesting facility within two (2) business days.

   O. Officer's Rules of Conduct

     1.     Officers must conduct themselves in a professional manner at all times.
     2.     Officers are responsible for their own meals.
     3.     Officers are to follow designated isolation precautions as instructed.
     4.     All incidents involving officers and their inmates/suspects will be reported to Security.
     5.     Officers will not vacate their post until properly relieved.

**ADMINISTRATIVE RESPONSIBILITY:**

The Hospital Administrator has day-to-day administrative responsibility for this policy.

Next Review Date: 9/2008

Supercedes:  None

| Greater Southeast Community Hospital | | Page 1 of 3 |
|---|---|---|
| Title: | Care of Patient under legal or correctional restriction Under Legal or Correctional Restrictions | Addendum A |
| Policy No: | ADM 03-019A | Effective/Revised Date: 9/2005 |

## OFFICER/FORENSIC STAFF ORIENTATION

### Patient Interaction
No officer/forensic agent may speak to a patient whose condition has been classified as _critical_ unless approved by the attending physician.

### Confidentiality
All conversations between a patient and his/her physician are confidential. Any conversation overheard regarding any other patient is equally confidential. You may be asked to sign a confidentiality statement.

### Patient Interrogation
Hospital staff may _not_ act as a witness to criminal interrogation.

### Patient Rights
If you have questions regarding patient rights, contact the clinical manager and/or patient advocate and request written information on Patient Rights/Responsibilities and Advanced Directives.

### Patient Belongings
The law enforcement agency bringing the patient under legal or correctional restrictions/patient to the hospital is responsible for the patient and his/her belongings.

### Patient Searches
Hospital will not assist in searching a patient under legal or correctional restriction /patient.

### Access
Officer/forensic staff will not have access to restricted areas of the hospital. The person in charge of the area will advise the officer/forensic agent if he/she is permitted to accompany the patient under legal or correctional restrictions/patient. The officer/forensic agent is responsible for screening visitors of the patient under legal or correctional restrictions/patient.

### Patient "Holds"
The hospital, nor any of its staff, have the right to detain a patient under legal or correctional restrictions/patient when there is _no_ law enforcement officer present.

### Potential Weapons
The hospital staff will make every _reasonable_ effort to minimize access by the patient under legal or correctional restrictions/patient to medical devices which could be used as a weapon.

### Isolation

| Greater Southeast Community Hospital | | Page 2 of 3 |
|---|---|---|
| Title: | Care of Patient under legal or correctional restriction Under Legal or Correctional Restrictions | Addendum A |
| Policy No: | ADM 03-019A | Effective/Revised Date: 9/2005 |

Hospital isolation policies must be followed. Hospital staff will advise officer of limitations and expectations.

## RESPONSE TO UNUSUAL CLINICAL EVENTS

If the officer/forensic agent with the patient under legal or correctional restrictions/patient requires immediate assistance (i.e., patient under legal or correctional restrictions patient goes into cardiac arrest, becomes combative), he/she should activate the nurse call light. If you are in an area where there are no call lights, dial the appropriate emergency phone number.

If the officer/forensic agent witnesses and/or is involved in an incident that results in physical injury (either to the officer/forensic agent or patient under legal or correctional restrictions/patient), the officer/forensic agent must complete an incident report. Contact the person in charge of the area for the appropriate form.

If the officer/forensic agent is exposed to a biohazard, the person in charge of the area will direct the agent to a safe area until the patient's treatment no longer represents the risk of a biohazard exposure.

## RESTRAINTS

Patient under legal or correctional restrictions/patient is to be cuffed/shackled at all times. Officer/forensic agent may not leave immediate area if the patient under legal or correctional restrictions is in cuffs/shackles. ***EXCEPTION: Removal of cuffs/shackles by the officer/forensic agent will occur to provide care or if medically contraindicated.***

Soft and/or leather restraints may *not* be substituted for cuffs or shackles. If medically indicated, restraints may be applied in addition to cuffs or shackles. GSCH restraint use policy and procedures will be followed.

## GSCH POLICIES/PROCEDURES

The area that has first contact with the officer/forensic agent will notify Security.

Security will meet with the officer/forensic agent and establish a line of communication to be utilized throughout the patient under legal or correctional restrictions/patient's hospital stay.

Smoking is *not* permitted in the GSCH.

Officers/forensic agents must park in designated areas as directed by Security.

Officers/forensic agents must notify Security whenever the patient under legal or correctional restrictions is transported, i.e., surgery, tests, discharge, etc.

| Greater Southeast Community Hospital | | Page 3 of 3 |
|---|---|---|
| Title: | Care of Patient under legal or correctional restriction Under Legal or Correctional Restrictions | Addendum A |
| Policy No: | ADM 03-019A | Effective/Revised Date: 9/2005 |

## EMERGENCY CODES

All staff must be knowledgeable of the requirements and individuals roles in case of fire, disaster and / or medical emergency.

 In the event of a fire the officer/forensic agent is to remain in the patient under legal or correctional restrictions/patient's room with the door closed until an "all clear" has been announced or evacuation of the area is ordered.

Disaster:  per manual and policy

Medical Emergency:  Team member will be permitted immediate access to the patient upon presentation of a valid picture card.  The Correctional Officer will shakedown the area immediately after the Code Blue Team has left the locked ward.

In the event that an evacuation is ordered, the patient under legal or correctional restrictions/patient will be assessed for his/her ability to ambulate and risk of escape by the registered nurse (RN), and officer/forensic agent.  Patient under legal or correctional restrictions/patient (with shackles or handcuffs intact), and officer/forensic agent will be evacuated together. de

Infection Control Policies:
GSCH will provide a copy of the Hospitals Infection Control Manual.

OSHA
The Department of Corrections will provide education on all relevant OSHA standards to their officer / staff involved in direct care on an annual basis.

Resources:  Snyder, R. and Westerfield, J., From Chaos to Excellence Preparing for a Successful Joint Commission
          Survey, JONA, Vol 27, No. 7/8, July, 1997..
          2001 Comprehensive Accreditation Manual for Hospitals, JCAHO.

**GENERAL ORDER**

| | SERIES | NUMBER | EFFECTIVE DATE |
|---|---|---|---|
| | 502 | 7 | January 17, 1975 |

| SUBJECT: Medical Treatment and Hospitalization for Prisoners | DISTRIBUTION A |
|---|---|
| | ORIGINATING UNIT PDD |

The purpose of this order is to establish the policy and procedures to be used in the medical treatment and/or hospitalization of prisoners. This order consists of the following parts:

> PART I      Responsibilities and Procedures for Members of the Department
>
> PART II     Responsibilities and Procedures for Special Assignment Personnel
>
> PART III    Responsibilities and Procedures for Supervisory and Command Personnel

PART I

    A.  <u>Medical Treatment.</u>

        1.  Persons held in departmental confinement facilities who claim a need for medical treatment due to <u>any</u> injury or disease shall be immediately transported to D.C. General Hospital for examination and treatment.

        2.  When a prisoner is brought to a police station suffering from a recent injury, such prisoner shall be immediately taken to D.C. General Hospital for examination and treatment. A report on PD Form 313 (Arrestee's Injury or Illness Report and Request for Examination and Treatment) shall be prepared noting all the facts in the case, including a notation of all cuts, bruises, or other injuries visible to the officer at the time the person was arrested, as well as the results of the examination by the doctor. The same complaint number obtained from the arrest report shall be utilized when preparing PD Form 313.

        3.  A prisoner who has been taken to D.C. General Hospital for medical treatment and returned to the station and confined in a cell and who again complains of being ill shall be returned to the hospital

- 4 -

this facility is in use, a D.C. Department of Corrections
Officer is detailed to guard the prisoners confined there-
in.

        a.    Officers responding to the scene of a
felony and arresting a perpetrator who
is in need of hospitalization shall
make arrangements to transport the
prisoner <u>under guard</u> to D.C. General
Hospital for subsequent confinement in
the strongroom. The prisoner shall
be processed through the admitting
office; and if after preliminary treat-
ment, he is to be admitted to the hos-
pital, he shall be transferred <u>under
guard</u> to the strongroom. The guard on
duty at the strongroom will assume cus-
tody of the prisoner.

        b.    Prisoners charged with felonies, and
admitted to D.C. General Hospital, who
are placed other than in the strong-
room will also be guarded by officers
of the D.C. Department of Corrections.

D.    <u>Admissions to Hospitals Other Than D.C. General.</u>

    1.    If a prisoner's condition is so grave as to
necessitate his removal to a hospital other than D.C.
General Hospital, and the prisoner is admitted to that hos-
pital, the arresting officer will immediately notify the
official then in charge of his element and a guard detail
shall be instituted by that official.

    2.    At the beginning of each tour of duty, officers
assigned to guard duty at hospitals shall complete PD Form
312 (Daily Report of Prisoners Guarded at _____
Hospital). Proper entries shall be made as are required for
each tour of duty. An officer reporting as a relief for
this detail shall personally contact the officer he is re-
lieving. Both officers shall make bed checks of all priso-
ners under guard. Each prisoner shall be identified by name
and the charge(s) on which he is being held. Special infor-

- 5 -

mation concerning the prisoner shall he relayed to the re-
lieving officer.  When the relieving officer is satisfied
that each prisoner is present and accounted for, he shall
sign the daily report certifying the receipt of the pri-
soner(s).  He shall then be responsible for the prisoner(s)
until relieved in the same manner at the expiration of his
tour of duty.  Officers on guard detail at hospitals shall
not leave their post at the expiration of his tour of duty
until properly relieved.  An officer on duty guarding a
prisoner, upon receiving a telephone call from an official
of the district in which the hospital is located advising
him that he is relieved, shall not be considered officially
relieved until he personally returns the telephone call to
that district and verifies the order from the same official.

    3.    Officers detailed to guard prisoners at
hospitals shall exercise every precaution to prevent the
escape of such prisoners; and, should it become necessary
for an officer to leave the immediate vicinity of the room
for any purpose, it shall be his duty, and he shall be held
personally responsible, for seeing that all measures are
taken to prevent the escape of any prisoner.  If a guard
over a prisoner must be relieved during his tour of duty
for any reason and before the time when his relief is
scheduled to report, the officer shall so advise a super-
vising official of the district in which the hospital is
located, and that official shall make arrangements for his
relief.

    4.    Officers detailed to guard prisoners at
any hospital shall retain and wear their service revolvers.

    5.    It shall be the responsibility of the
officer on guard duty at the hospital to follow up cases
of prisoners under guard in order to determine when the
prisoner can be taken to court.  When the prisoner can be
taken to court, this officer shall immediately notify an
official of the district in which the hospital is located,
who shall notify the Field Operations Bureau and the
organizational element to which the arresting officer is
assigned, as soon as possible.

    E.   **Juveniles.**

    A juvenile prisoner transported to D.C. General
Hospital or elsewhere for examination and/or treatment
shall be processed in the same manner as an adult, except

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DONALD RAY HINTON | ) |
| | ) |
|     Plaintiff | ) |
| | ) |
|     v. | )     Case No.: 1:07-cv-00807 |
| | ) |
| THE DISTRICT OF COLUMBIA, *et al.* | ) |
| | ) |
|     Defendants | ) |
| _____ | ) |

## <u>ORDER</u>

    Upon consideration of Defendants' Partial Motion for Summary Judgment, and

Plaintiff's opposition thereto, it is by this Honorable Court this _____ day of

_____, 2008, hereby

    ORDERED, that Defendants' Partial Motion for Summary Judgment be and is

hereby DENIED.

 

                             _____

                             Judge James Robertson